710 P.2d 580

**STATE of Idaho, Plaintiff-Respondent, Cross-Appellant,**

v.

**Claude Lafayette DALLAS, Jr., Defendant-Appellant, Cross-Respondent.**

**No. 14935.**

Supreme Court of Idaho.

Nov. 20, 1985.

William L. Mauk, of Skinner, Fawcett & Mauk, Boise, for defendant-appellant, cross-respondent.

Jim Jones, Atty. Gen., and Lynn Thomas, Sol. Gen., Boise, for plaintiff-respondent, cross-appellant.

DONALDSON, Chief Justice.

This appeal arises out of the conviction of appellant, Claude Dallas, for voluntary ·manslaughter following the fatal shooting of two Idaho Department of Fish and Game conservation officers in January of 1981. The events surrounding the shooting can be summarized as follows:

On the evening of January 4, 1981, Ed Carlin, a trapper, telephoned Idaho conser-

vation officer Bill Pogue to report finding illegal traps in the vicinity of the "45 Ranch" in Owyhee County near the Idaho-Nevada border. Pogue indicated he would be out in a day or two to check the traps. When Carlin responded that a day or two would be too late, Pogue stated he would leave immediately. He then arranged for fellow officer Conley Elms to accompany him and the two men left Boise at approximately 12:00 a.m. that same evening. They arrived at the 45 Ranch early the following morning. Over breakfast at the Carlin residence, Pogue asked if there were any other trappers in the area. Carlin stated that, in addition to some Oregon trappers, there was a trapper named Claude Dallas camped at nearby Bull Camp. Don Carlin, Ed Carlin's son, further stated that on a recent visit to Dallas's camp he had observed several deer carcasses and two bobcat hides. (The seasons for hunting deer and trapping bobcats in Idaho had been closed for some time).

After breakfast, Don Carlin accompanied the officers to the site of the illegal traps. Carlin left them there and the officers proceeded to locate and issue a citation to the owner of the traps. Shortly thereafter, Don Carlin encountered the officers on the road back to the ranch. The subject of Claude Dallas was again mentioned and Carlin gave the officers directions to Dallas's camp.

Bull Camp is located in a remote basin on the banks of the South Fork of the Owyhee River approximately 13 miles east of the Oregon border and 3 miles north of the Nevada border in Owyhee County. A dirt road extends to the rim of the basin above the camp. The camp itself is accessible by following a foot-trail approximately three-quarters of a mile down the rim and into the basin. Claude Dallas had established a trapping camp in Bull Camp in early December of 1980.

On the morning of January 5, 1981, at the same time the officers were investigating the trapping violation nearby, Jim Stevens, a friend of Dallas's, arrived at Bull Camp for a visit. The confrontation which ultimately resulted in the officers' deaths began when Dallas walked up to the rim to retrieve some of Stevens's supplies. There he encountered officers Pogue and Elms. Pogue, Elms and Dallas then walked down the trial to Dallas's camp.

The facts surrounding the shooting are in dispute. At some point, the officers disarmed Dallas of a .22 pistol which he was carrying in a shoulder holster. However, Dallas was also armed with a .357 magnum revolver located in a hip holster and that weapon was not removed. The officers also checked Stevens's pistol and removed the bullets before returning it to him. According to Dallas's version of the incident, Officer Pogue's behavior was aggressive and threatening, causing Dallas to fear for his life. He contends that he shot Pogue only after the officer reached for his revolver, and that he and Pogue shot at the same time. At trial, Dallas described the shooting as follows:

> "He [Pogue] fired one round. I fired— his gun went off, you know, I fired again, and I spun Conley Elms, and he was going for his gun, and I fired one round at Elms, and Pogue was going down and bringing a gun to bear on me. I just threw two more rounds at Pogue, and Elms was crouched, and I threw one at Elms, and then I just ran back into my tent and grabbed my .22. It was inside of the tent. I ran out, shot both men in the head. They were on the ground. Elms was face down and Pogue was on his back."

The state contends, on the other hand, that Dallas shot and killed both Pogue and Elms without provocation when it appeared that they were going to arrest him, and that neither officer had a chance to return fire.

It is undisputed that Dallas shot Elms twice and Pogue several times with a .357 magnum revolver. He then obtained a .22 rifle and fired a single shot into the head of each officer. Thereafter, Dallas, with Stevens's assistance, attempted to erase the evidence of the killings.

William Pogue's body was loaded onto a mule and carried from the camp site up the

canyon to the spot where Stevens had left his vehicle. Conley Elms's body was also loaded on the back of a mule. Elms's body slipped off the mule, however, and the two men were unable to lift it back on. The body was then dragged behind the mule to the river and dumped in.

After burning some of the evidence of the shooting, Dallas and Stevens loaded Pogue's body into Stevens's Blazer and drove to Paridise Hills, Nevada, several hours away. Their destination was the home of a mutual friend, George Neilson. Dallas borrowed Neilson's truck and went out into the desert to dispose of Pogue's body. (The body was not located until after the trial). Neilson then drove Dallas to Sand Pass Road and Dallas disappeared on foot into the desert.

Dallas was apprehended by the FBI some 16 months later following a high-speed chase across the Nevada desert. He was charged with two counts of first degree murder, use of a firearm in the commission of a felony, resisting officers in the lawful performance of their duties, and destruction or concealment of evidence. Trial commenced on September 15, 1982 and concluded some six weeks later on October 24. Dallas presented a self-defense theory at trial, largely through his own testimony. The jury acquitted him of first and second degree murder and of the resisting arrest charge. He was convicted on two counts of voluntary manslaughter, two counts of use of a firearm in the commission of a felony, and a misdemeanor charge of concealment of evidence.

Dallas was sentenced to an indeterminate 10-year term on each of the voluntary manslaughter counts, to run consecutively. The court also enhanced his sentence, pursuant to I.C. § 19–2520, with an additional consecutive 10-year term for the use of a firearm in the commission of a felony. In addition, he was sentenced to six months in the county jail for the concealment conviction with credit for the 209 days he had already served. This appeal followed.

Dallas has raised numerous issues on appeal. First, he contends that the two consecutive 10-year indeterminate sentences imposed for the voluntary manslaughter convictions constitute an abuse of sentencing discretion. Second, he contends that the enhancement of the manslaughter sentences with an additional 10-year sentence for his use of a firearm constitutes a further abuse of discretion. Third, he asserts that the trial court violated I.C. § 19–852 and his constitutional right to due process, equal protection and effective assistance of counsel by refusing to provide funds for more than one defense attorney. Fourth, he argues that there was insufficient evidence to support the voluntary manslaughter convictions. Fifth, he asserts that the trial court erred in excluding evidence of the victims' character. Sixth, he argues that the trial court should have imposed sanctions on the state for withholding exculpatory evidence in its possession. Finally, he objects to the trial court's disqualification of a venireperson on the basis of his opposition to the death penalty without first allowing individual voir dire. The state has cross-appealed asserting that the trial court erred in admitting evidence of the victims' character and in excluding two of the state's exhibits. We will address each issue in turn.

I.

Dallas first contends that the two consecutive 10-year indeterminate sentences he received for the voluntary manslaughter convictions constitute an abuse of discretion. It is well settled that sentencing is committed to the discretion of the trial judge. Where a particular sentence is within the statutory maximum, it will not be disturbed on appeal absent a "clear abuse of discretion." *See, e.g., State v. Lopez,* 102 Idaho 692, 638 P.2d 889 (1981); *State v. West,* 102 Idaho 562, 633 P.2d 1140 (1981).

■ Former I.C. § 18–4007 provided that the maximum term of confinement for vol-

untary manslaughter was 10 years.[1] The sentence imposed in the present case—if fully served, without parole—could equal, but would not exceed, the statutory maximum. Thus, appellant has the burden of affirmatively demonstrating that the sentence he received constitutes a clear abuse of discretion.

This Court has articulated four objectives of criminal punishment: (1) protection of society; (2) deterrence of the individual and the public generally; (3) the possibility of rehabilitation; and (4) punishment or retribution for wrong doing. *State v. Wolfe*, 99 Idaho 382, 384, 582 P.2d 728, 730 (1978). Dallas submits that the sentence he received constitutes an abuse of discretion because it exceeds the maximum necessary to accomplish those goals. He argues that protection of society and rehabilitation are not genuine issues in this case and that general deterrence and punishment could be achieved by a shorter sentence. He further argues that the trial judge abused his discretion by allowing his personal conclusions on the issue of self-defense to influence his sentencing decision and by considering two improper factors in determining the length of sentence. We address each argument in the order stated.

■ Dallas first asserts that the two consecutive 10-year terms exceed the maximum necessary to achieve the four sentencing objectives enumerated above. It is his position that given what he considers to be the significant mitigating factors in his case, to wit: the element of self-defense, his absence of prior felony convictions, his compliance with the court's instructions while free on bond, and his general good character, the imposition of the maximum sentence for each manslaughter conviction was unreasonable.

The fundamental requirement in sentencing is reasonableness. A sentence will be found to constitute a "clear abuse of discretion" where it is shown to be unreasonable under the facts of the case. *State v.*

*Nice,* 103 Idaho 89, 90, 645 P.2d 323, 324 (1982). With this standard in mind, our task on appeal is to examine the circumstances of the case before us to determine whether the punishment imposed was excessive.

The sentencing transcript in this case reveals that the trial judge carefully considered each of the four objectives of criminal punishment in arriving at his sentencing decision. He found that given the fact that the victims were peace officers and that the crime was so egregious, deterrence and the protection of society were of crucial importance in this case. He did note, however, that in his view rehabilitation would not be a problem.

The court focused on the extreme violence of the incident and the fact that Dallas shot and killed Officer Elms without giving him an opportunity to surrender his weapon. The trial judge said to Dallas,

"Again, with your expertise, the fact that you knew the postion of the officers and did not give Mr. Elms an opportunity to have either dropped his hand or dropped the gun if he actually got the gun drawn, is totally inexcusable, and you are not in a position to argue that you had to kill him to secure your own life. Mr. Pogue by this time had already been shot backwards and had not pulled that gun. You had your gun drawn and were in a cross position and in a position to do him in at any time.

"In addition to that, and I do not like to dwell on the ugly, but you did go into the camp, you took your rifle, the .22, and you came and you shot both officers, prone on the ground, in the head, both in a motionless position."

He noted that the statements Dallas made to Jim Stevens after the shooting and the way in which Dallas attempted to cover up the evidence, were indicative of a person who had committed a crime rather than one who had acted in defense of his life.

---

1. I.C. § 18–4007 was repealed effective May 19, 1983. The new version of I.C. § 18–4007 pro-

vides for a maximum confinement of 15 years.

The trial judge focused on Dallas's method of disposing of the officers' bodies and noted that the fact that he did not reveal the whereabouts of Officer Pogue's body until several weeks into the trial was particularly egregious. Additionally, he noted that Dallas vanished to avoid detection after the shooting and that when he was located some 16 months later, he burst through a window and attempted to escape. He was apprehended only after a high-speed chase across the desert and was heavily armed at the time he surrendered.

Relying on these facts, the trial judge concluded that the killings were totally unjustified and were accomplished with little or no remorse. Therefore, he sentenced Dallas to the maximum term allowed by law for each offense. Because of Dallas's general good reputation and lack of a prior criminal record, he tempered the harshness of the sentences by making them indeterminate.

After reviewing the record in this case and considering the facts the trial judge had before him, we cannot say that the sentence imposed was unreasonable or an abuse of discretion.

▌ Dallas next contends that the trial judge abused his sentencing discretion by ignoring the jury's findings on self-defense, and, instead, substituting his own contrary finding. Because the jury was instructed that first degree murder could be proven by evidence of any murder of a peace officer acting in the lawful discharge of an official duty, and because the jury did not convict him of first degree murder, Dallas contends that the jury necessarily found that the officers were acting beyond the scope of their official duties and that he, Dallas, was justified in using deadly force to defend himself. The trial judge indicated in his sentencing remarks that he did not feel the issue of self-defense arose at Bull Camp. Therefore, Dallas concludes the trial judge ignored the jury's finding on self-defense and substituted his own contrary conclusion.

There are two flaws in Dallas's argument. First, it is unsupported by the verdict. The jury was instructed that self-defense is a complete defense to a charge of homicide. However, the jury did not acquit Claude Dallas. Instead, he was convicted of two counts of voluntary manslaughter. Thus, there is nothing in the verdict to support Dallas's view that the jury found he acted in self-defense.

Second, Dallas's argument misconceives the role of the trial judge at the sentencing stage. Once a criminal defendant's guilt has been established, the trial judge is under a duty to tailor the sentence to the individual defendant. *State v. Johnson*, 101 Idaho 581, 618 P.2d 759 (1980); *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied, Sivak v. Idaho*, — U.S. —, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984). To fulfill this duty, the trial judge must have access to a broad range of information. During the sentencing process in this case, the trial judge received information concerning Dallas's character and inclinations to which the jury did not have access. Thus, even were we to accept Dallas's claim that the jury found he acted, at least initially, in self-defense, that finding would not necessarily be inconsistent with the trial judge's statement that he did not feel self-defense was an issue in this case. The two findings would be based on different ranges of information. *See State v. Sivak*, *supra* at 907, 674 P.2d at 403.

▌ Finally, Dallas argues that the trial judge considered two improper factors in arriving at his sentencing decision: the status of the victims as public officials, and the assertion that Dallas "fired certain rounds" in attempting to escape.

The sentencing transcript confirms that the trial judge did consider the victims' status as public officials in arriving at his sentencing decision.

"If we kill a person who represents a public official, we are going to be treated more harshly than if we kill maybe somebody else, and the reason that must happen is because these people are put in jeopardy every day of their lives and they need that extra protection. We

need to get that message out, that when it comes to law enforcement we do not argue about whether the officials have the right or we have the right. We do that at a later time in a court of law. They cannot be put in a position where they have to be put on the defense. If they do not carry out the law, they will be held accountable, but not in that position and not in the field situation."

Dallas contends that because the jury found him not guilty on the charge of resisting arrest, the trial judge should not have considered the victims' status as public officials. We do not agree.

The fact that the jury did not convict Dallas of resisting arrest does not alter the fact that the victims were indeed peace officers. Even assuming that the officers were overly aggressive in their behavior toward Dallas, this did not give him the right to shoot them. As the trial judge noted, the proper place for challenging the propriety of an officer's conduct is in a courtroom, not in a gun battle. We agree with the trial judge that society's interest in law enforcement is an important factor in this case and that the victims' status as public officials was a relevant consideration.

Dallas's assertion that the trial judge erred in considering the fact that he may have fired certain rounds in attempting to escape merits little discussion. The trial judge simply noted in his sentencing remarks that the state had presented evidence that Dallas fired at his pursuers in attempting to escape apprehension.

"And then there was your attempt to escape through the brush and the state's evidence is that you fired certain rounds and nobody, fortunately, was hit if you did. I do not know that this is extremely important one way or another, except for the fact that you had weapons in your possession and you were ready to use them, and everybody connected with the situation believed that you would use them.

The judge's remarks express no opinion as to whether Dallas did or did not fire at his pursuers. In any case, the state presented three witnesses who testified that they either saw or heard shots coming from the pickup in which Dallas was fleeing. Therefore, there was evidence from which the trial judge could conclude that Dallas did fire some shots during his escape attempt.

## II.

Dallas contends that the enhancement of the manslaughter sentences with an additional 10-year indeterminate sentence because of his use of a firearm in the commission of the crime constitutes a further abuse of sentencing discretion. He submits that the trial judge considered his use of a firearm both in arriving at the underlying manslaughter sentence and in adding to that sentence pursuant to I.C. § 19–2520. Thus he contends that he was punished twice for the same behavior.

I.C. § 19–2520 provides that any person convicted of manslaughter who used a firearm while committing the crime, "shall, in addition to the sentence imposed for the commission of the crime, be imprisoned in the state prison for not less than three (3) nor more than fifteen (15) years." I.C. § 19–2520. In effect, the legislature has elected to fix two different penalties for the crime of manslaughter—a lesser penalty where the crime was committed without the use of a deadly weapon, and a greater one where a deadly weapon was involved. It is undisputed that Dallas did use a firearm in the commission of the crime. Thus, the trial judge was authorized to enhance his manslaughter sentence pursuant to I.C. § 19–2520. The 10-year sentence was well within statutory maximum, and we find no abuse of discretion.

## III.

Dallas asserts that the trial court violated I.C. § 19–852 and his constitutional right to due process, equal protection and effective assistance of counsel by refusing to provide funds for more than one defense attorney. Whether the trial court erred in electing to appoint only one defense attorney is a question that need not be ad-

dressed on this appeal. Despite the fact that he was not appointed, Mr. Mauk assisted Mr. Donnelley at trial and, therefore, it is fruitless for us to speculate on what might have happened had he not done so.

Dallas asks this Court to order reimbursement of Mr. Mauk's unpaid attorney fees in the amount of approximately $4,000.00 plus interest thereon. It appears from the record that Dallas's family initially retained the law firm of Skinner, Donnelley, Fawcett & Mauk on Dallas's behalf in February of 1982. On September 10, 1982, Dallas filed a motion requesting that the entire firm be appointed to represent him at public expense. Following a hearing, on September 14, the court appointed Michael Donnelley as counsel for the defendant. Mr. Mauk continued to assist with Dallas's defense, however.

After trial, the defense made renewed requests for appointment and payment on behalf of Mr. Mauk. In particular, they sought payment of attorney fees in the amount of $8,005.50. On November 9, 1982, the court ordered payment of costs and of Mr. Donnelley's fees. On October 5, 1983, Mr. Mauk was appointed defense counsel on appeal. At that time, the court ordered that Mr. Mauk be reimbursed $4,000.00 as reasonable attorney fees stating:

"The Court having reviewed the claim of William Mauk in the above-entitled matter and the Affidavits of the attorneys in support thereof, and having further considered the delays that likely would have occurred but for the assistance of Mr. Mauk on various matters that arose during the course of the trial, and having further considered the additional expense that would likely have occurred as a result thereof, and it further appearing to the Court in retrospect that defense counsel were to some extent justified in believing that additional help was required to assure that the defendant received a fair trial in light of the assistance that was available to the State, and good cause appearing therefor,

"IT IS HEREBY ORDERED, AND THIS DOES ORDER, that the County Commissioners of Owyhee County, Idaho, pay to William Mauk as and for reasonable attorney's fees the sum of $4,000.00."

Claude Dallas was provided with an attorney at public expense. His request for additional counsel was a matter committed to the sound discretion of the trial court. Cf. State v. Olin, 103 Idaho 391, 648 P.2d 203 (1982) (denial of a request for expert or investigative assistance will not be disturbed absent a showing that the trial court abused its discretion by rendering a decision which is clearly erroneous and unsupported by the circumstances of the case). The trial court determined that Mr. Mauk rendered the defense valuable services and, despite the fact that he had not been appointed defense counsel, awarded him $4,000 as reasonable attorney fees. A trial court's determination of reasonable attorney fees will not be overturned on appeal unless it is clearly erroneous. Craft Wall of Idaho, Inc., v. Stonebraker, 108 Idaho 704, 701 P.2d 324 (Ct.App.1985). While we recognize that Mr. Mauk has invested a great deal of time and effort in this case, we cannot say that the trial court's award was clearly erroneous.

## IV.

Dallas asserts that there was insufficient evidence to support his voluntary manslaughter convictions. His argument supporting this assertion begins with the premise that the jury found he fired the initial series of shots in self-defense. He submits that the only way the jury verdict in this case can be explained is by dissecting the shooting into two segments: the first segment consisting of the revolver shots, and the second of the rifle shots to the head of each victim. He contends that the jury found he acted in self-defense in the first segment and that it was for the second segment, the rifle shots to the head of each victim, that he was convicted of voluntary manslaughter.

Based on this premise, Dallas asserts that his convictions must be overturned since the state's medical evidence, was insufficient to support a finding that the two officers were alive when the rifle shots were fired. It is not manslaughter, he concludes, to shoot a dead body.

In the alternative, Dallas argues that, even assuming there was sufficient evidence that the officers were alive when the rifle shots were fired, a reasonable jury still could not have convicted him of voluntary manslaughter. This argument is again premised on the assumption that the jury found Dallas acted in self-defense in firing the revolver shots. Dallas asserts that the circumstances which gave rise to his right of self-defense were the same circumstances which provoked the extreme passion necessary for a finding of voluntary manslaughter. He argues that the time interval between the two sets of shootings was insufficient to permit his passion to cool and to allow reason to reassert itself. Thus, he concludes that a reasonable jury, having found he was initially acting in self-defense, could not have convicted him of voluntary manslaughter for firing the rifle shots.

The underpinning of Dallas's argument on this issue is his assertion that the jury found he acted in self-defense when he fired the initial series of revolver shots at the two officers. Once this underpinning is rejected, the argument topples. As we indicated in part I above, there is nothing in the jury verdict to suggest that the jury found Dallas acted in self-defense at any stage of the shooting. The jury returned a general verdict convicting Dallas of two counts of voluntary manslaughter. There is no factual or legal basis for separating that verdict into self-defense and non-self-defense segments. This Court will not accept the appellant's invitation to engage in speculation as to what may have occurred in the jury room. However, were we so inclined, we note that the most reasonable explanation for a conviction of voluntary manslaughter is that the jury simply found the defendant acted upon a sudden quarrel or in the heat of passion, without malice.

Additionally, we note that there was evidence which indicated that the victims were alive when the rifle shots were fired. The state's pathologist, Dr. Garrison, testified that in his opinion Conley Elms was alive when he was shot in the head. William Pogue's body was not located prior to trial. However, Jim Stevens testified that he observed blood flowing from Pogue's head wound. Dr. Garrison stated that the blood flow indicated cranial activity. The presence of cranial activity, he testified, in turn indicates that Pogue was alive when the rifle shots were fired. Thus, the jury could have found that the officers were alive when the final shots were fired.

## V.

Perhaps the most hotly contested issue at trial was the issue of the admissibility of evidence of the victims' character. Because Dallas relied on the theory of self-defense, the question of who was the first aggressor at Bull Camp assumed crucial importance. The defense sought to introduce evidence showing the victims' tendency toward aggressiveness to raise an inference that the victims provoked the homicide. Specifically, the defense sought to introduce evidence of specific acts by the victims that would show a tendency toward aggressive behavior.

The trial court initially limited the introduction of character evidence to testimony concerning the victims' general reputation for turbulence, quarrelsomeness or dangerousness in the community. Evidence of specific acts was ruled inadmissible. However, following an offer of proof and additional memoranda by the defense, the court ultimately ruled that the defense could introduce evidence of specific conduct by Officer Pogue which tended to show a character trait for hostility or violence. The court confined its ruling to instances occurring after 1975 and refused to allow any such evidence with regard to Officer Elms.

The trial judge based his ruling on the Federal Rules of Evidence, specifically Rules 404 and 405. He noted that this

Court had appointed an evidence committee to study the federal rules and stated that he had been advised that the committee had recommended their adoption. Because he felt that the evidence in question would have been admissible under the federal rules, he allowed it in at trial.

On appeal, Dallas contends that this ruling was too narrow. He asserts that the court erred both in limiting the evidence to instances occurring after 1975 and in excluding any evidence of specific acts by Officer Elms.

The trial court was correct in assuming that Idaho would eventually adopt a set of rules similar to the federal rules.[2] However, at the time this case was decided the rules had not yet been adopted and, therefore, the common law was controlling. Prior to our adoption of the Idaho Rules of Evidence, the law on this issue was set out in *State v. Wilson*, 41 Idaho 616, 243 P. 359 (1925).

"Where self-defense is interposed and it appears that there was more or less a mutual combat between the parties, the reputation of the deceased for being turbulent, quarrelsome and dangerous, if communicated to the appellant prior to the affray, is admissible as bearing upon the question of who was the probable aggressor and whether or not the appellant had reasonable cause to believe that his life was in danger. (Citations omitted). *This rule, however, may not be extended to include specific acts.*" *Id.* at 631, 243 P. at 362 (emphasis added). *See also*, G. Bell, Handbook of Evidence for the Idaho Lawyer, at 149–50 (1972).

It is clear from this language that Idaho law did not permit the accused to introduce evidence of specific instances of the victim's prior conduct in order to support an inference that the victim was the first aggressor. The reason for this prohibition is that evidence of specific instances of the victim's conduct, while probative, tends to be highly prejudicial. 22 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5237, at 399 (1978). The bad character of the deceased is likely to be thought of by the jury as an excuse for the killing. Learning of the victim's bad character could lead the jury to conclude that the victim merely "got what he deserved" and to acquit for that reason. Accordingly, the majority view is to disallow such evidence. Comment, Admissibility of Evidence of Homicide Victim's Character Where Defendant Pleads Self-Defense, 13 Suffolk L.Rev. 1135, 1140 (1979).[3]

We conclude that rather than being too narrow, the trial court's ruling was actually too broad. Thus, Dallas has no cause to complain that he was prejudiced in any way by the trial court's ruling on this issue.

## VI.

Dallas asserts that he was prejudiced by the trial court's failure to impose sanctions against the state for withholding exculpatory evidence in its possession and, therefore, that he is entitled to a new trial. Dallas asserts that in response to his request for discovery of the deceased officers' personnel records he received only "expurgated" copies which did not contain complaints filed against the officers.

---

2. On January 8, 1985, this Court adopted the Idaho Rules of Evidence. These rules became effective July 1, 1985.

3. The evidence would also be inadmissible under the federal rules. *See* 22 C. Wright & K. Graham, *supra* § 5237, at 404 (Rule 404(a)(2) does not admit evidence of specific instances of the victim's conduct to prove character); E. Cleary, McCormick on Evidence § 193, at 571–72 (1984) (accused may introduce appropriate evidence of the victim's character for turbulence and violence; evidence of past acts of violence

is not an appropriate mode of proof); 2 D. Louisell & C. Mueller, Federal Evidence § 139, at 105 (1978) (Rule 405 limits an accused to introducing opinion and reputation testimony to show the victim's character, specific instances of conduct may not be proved). I.R.E. 404 and 405 are identical to the Federal Rules. The Idaho Evidence Committee's comments indicate that I.R.E. 404 and 405 will not change existing Idaho law. *See* M. Clark, Report of the Idaho State Bar Evidence Committee, C 404 p. 1–4 and C 405 p. 1–3.

It appears from the record that there were two sets of personnel records in existence, one set in the local Fish & Game office and another in the regional office. The latter set included any complaints filed against the officers while the former did not. It was the former set—the set without complaints—that the defense received in response to its discovery request.

During the opening day of testimony at trial, Ray Lyon, a regional conservation officer with the Department of Fish & Game, testified that he had personnel records of the deceased officers in his office which contained complaints filed against the officers. Thereafter, the defense moved for discovery of those records and that request was subsequently granted. While the record indicates that the defense received the records so requested during the course of the trial, it does not indicate exactly when that receipt occurred.

■ The state has a constitutional duty to disclose exculpatory evidence material to the preparation of a defendant's case. U.S. Const. amend. XIV; ID. CONST. art 1, § 13; *State v. Olsen,* 103 Idaho 278, 282, 647 P.2d 734, 738 (1982). However, a delayed disclosure does not uniformly constitute reversible error. *Id.* at 283, 647 P.2d at 739. Where the question is one of late disclosure rather than failure to disclose, the inquiry on appeal is whether the lateness of the disclosure so prejudiced the defendant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial. *Id.; State v. Smoot,* 99 Idaho 855, 858–59, 590 P.2d 1001, 1004–5 (1978).

■ We cannot hold that the belated disclosure so prejudiced Dallas's preparation and presentation of his case that he was denied a fair trial. The fact that there were complaints in existence came to the defense's attention immediately following the opening of the state's case-in-chief. Dallas was able to obtain copies of any complaints and to utilize them in the presentation of his defense. In commenting on this matter, the trial judge indicated that there was no evidence of tampering or

bad faith on the part of the state and expressed his willingness to grant a continuance should it prove necessary. If the defense was prejudiced by the late disclosure, the proper recourse would have been to seek a continuance. *Olsen, supra* at 284, 647 P.2d at 740. Dallas has made no showing of prejudice and we conclude that no reversible error was committed.

## VII.

■ Finally, Dallas objects to the trial court's disqualification of a venireperson on the basis of his objection to the death penalty without first allowing for individual voir dire.

The record indicates that a prospective juror was asked to step down after he indicated that he could not convict the defendant of first degree murder knowing that the death penalty could be imposed for such a conviction.

"COURT: If you were selected to set [sic] as a juror in this matter do you know of any reason why you would be unwilling or unable to render a verdict based solely on the evidence and the law as given to you by the Court. Any religious or moral convictions that you might have, some churches, as I understand it, just do not want to set [sic] in judgment of their fellow man.

"MR. HOWARD: I could not render a death sentence.

"COURT: That takes us back to the question I asked earlier, is this because you are against the death penalty. Just because you are against the death penalty alone, does not disqualify you. The question is; Do you have any religious or moral convictions, beliefs or opinions that would prevent you from ever reaching a verdict of first degree murder, even though the evidence warranted it, when you know the penalty for such offense in the state of Idaho could be death. So the question is even if you find evidence to warrant a first degree murder conviction you would not sign a first degree murder

verdict, because of the possibility of the death penalty.

"MR. HOWARD: That is correct.

. . . .

"COURT: As I understand it, Mr. Howard, what you are saying I do not want to put words in your mouth, I simply want to know what your position is. You understand that just because you are against the death penalty does not disqualify you to set [sic] as a juror in this matter. The question is, if the evidence warranted it after you deliberated and all twelve of you agreed that the evidence is that the Defendant should be found guilty of first degree murder, you would refuse because of either religious or conscientious opinions. You would refuse to sign that verdict, knowing that in the state of Idaho the penalty could be the death penalty?

"MR. HOWARD: I could not sign that verdict."

Dallas cites *Witherspoon v. State of Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and the line of cases following it for the proposition that further questioning was required before Mr. Howard could be excluded. We disagree. We begin by noting that the *Witherspoon* Court specifically declined to reach the question of whether the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. *Id.* at 518, 88 S.Ct. at 1775. *Witherspoon* held only that a death sentence could not be carried out if the jury that imposed or recommended it was chosen by excluding venirepersons for cause simply because they voiced general objection to the death penalty or expressed conscientious or religious scruples against its infliction. *Id.* at 522, 88 S.Ct. at 1777. Claude Dallas was neither convicted of a capital offense nor sentenced to death. However, even assuming that the *Witherspoon* rule is applicable in the present case, we conclude that the trial court did not err in excluding Mr. Howard.

The *Witherspoon* court noted that venirepersons who make it "unmistakably clear" that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt are properly excluded. *Id.* at 522, n. 21, 88 S.Ct. at 1777, n. 21, *see also Lockett v. Ohio*, 438 U.S. 586, 596, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978). In the present case, Mr. Howard made it "unmistakably clear" that even were he to find that the evidence warranted a first degree murder conviction, he could not sign a first degree murder verdict because of the possibility that the death penalty might be imposed. He was thus properly excluded under *Witherspoon* even assuming, arguendo, that *Witherspoon* provides a basis for attacking the conviction as well as the sentencing in a capital case. *See Lockett, supra* at 596, 98 S.Ct. at 2960.

VIII.

■ The state has cross-appealed asserting that the trial court erred in its ruling on the admissibility of evidence of the victim's character and in excluding two of the state's exhibits. Our discussion on the admissibility of evidence of the victims' character is contained in Part V above and need not be repeated here.

As to the trial court's decision to exclude state Exhibits 91 and 92, we find no error. The exhibits consisted of two books, "No Second Place Winner" and "Kill Or Be Killed," taken from Dallas's residence in Paradise Hills, Nevada. The state asserted that the books were relevant to show Dallas's state of mind at the time of the shooting and to refute his claim that he shot in self-defense. The trial judge sustained the defense's objection to the admission of the books, ruling that their probative value was outweighed by the danger that they might prejudice the jury.

"The court believes that both of these exhibits may have some relevance, but the prejudicial effect outweighs that relevancy. That the jury could be mislead by the mere fact that these books are titled in the manner in which they are.

"They appear to be legitimate books for legitimate purposes, and to have the jury speculate that they were read for other purposes, I believe, is too dangerous."

The trial court is vested with discretion to determine whether the probative value of evidence outweighs any prejudicial effect, *State v. Abel,* 104 Idaho 865, 870, 664 P.2d 772, 777 (1983), and we find no abuse of that discretion here.

The decision of the trial court is affirmed.

SHEPARD and BAKES, JJ., concur.

HUNTLEY, Justice, concurring specially and dissenting in part.

I cannot agree with the majority's analysis of the issue of whether the district judge substituted his own judgment for that of the jury in sentencing Mr. Dallas. In particular, it was erroneous for the district court to impose a harsher sentence on Dallas because, in the court's words, "if we kill a person who represents a public official, we are going to be treated more harshly than if we maybe kill somebody else...."

Dallas was charged with the crime of murder in the first degree under two separate and distinct theories. He was charged with violating I.C. § 18–4003(a)[1] and with violating I.C. § 18–4003(b) which provides:

(b) Any murder of any peace officer, executive officer, officer of the court, fireman, judicial officer or prosecuting attorney who was acting in the lawful discharge of an official duty, and was known or should have been known by the perpetrator of the murder to be an officer so acting, shall be murder of the first degree.

The district court informed the jury that, "[f]or purposes of these instructions, an individual employed as a conservation offi-cer with the Department of Fish and Game, who has received certification from the Idaho Peace Officers Standards and Training Advisory Counsel, is a peace officer."

The district court also instructed the jury:

In this case, to warrant a verdict of guilty under Count I [charging Dallas with the murder of William H. Pogue] of the crime of First Degree Murder under either or both of the separate and distinct theories of murder, that is 1) a wilful, deliberate and pre-meditated killing, or 2) the murder of a peace officer who was acting in the lawful discharge of an official duty, you must find from the evidence that the State of Idaho proved each of the following essential elements beyond a reasonable doubt:

First Theory of First-Degree Murder (Count I)

1. The defendant, Claude LaFayette Dallas;

2. In Owyhee County, Idaho, on or about January 5, 1981;

3. With malice aforethought, wilfully, deliberately, and with pre-meditation, unlawfully and intentionally killed William H. "Bill" Pogue, a human being, by shooting and discharging a pistol, a rifle or gun into the body of said person and thereby directly causing the death of William H. "Bill" Pogue; or

Second theory of first-degree murder (Count I):

1. That the defendant, Claude LaFayette Dallas;

2. In Owyhee County, Idaho, on or about January 5, 1981;

3. With malice aforethought, wilfully, deliberately, unlawfully, and intentionally murdered *a peace officer, William H. "Bill" Pogue, who was acting in the lawful discharge of an official duty*, and was known or

---

**1.** I.C. § 18–4003(a) provides:

**18–4003. Degrees of murder.**—(a) All murder which is perpetrated by means of poison, or lying in wait, or torture, when torture is inflicted with the intent to cause suffering, to execute vengeance, to extort something from the victim, or to satisfy some sadistic inclination, or which is perpetrated by any kind of wilful, deliberate and premeditated killing is murder of the first degree.

should have been known by the defendant to be an officer so acting. (Emphasis added.)

The court similarly instructed the jury as to Count II of the Information which charged Dallas with the murder of Wilson Conley Elms pursuant to the above two theories.

In Count III of the Information, Dallas was accused of knowingly resisting Idaho peace officers through the use of violence or force. The court instructed the jury that to find Dallas guilty of the charge they must find:

... that each of the following material elements has been proven beyond a reasonable doubt:

1. That Claude Lafayette Dallas, Jr., acted knowingly;

2. That he resisted such officers by the use of force or violence; and

3. *That such officers were acting in the performance of a duty imposed by law, and were not using excessive force.* (Emphasis added.)

Dallas was *not* found guilty of first degree murder under *either* of the two theories. Moreover, he was acquitted of the charge of resisting officers.

As the majority notes, the jury found Dallas guilty of voluntary manslaughter and, since self-defense is a complete defense to voluntary manslaughter, the jury verdict does not require the inference that Dallas acted in self-defense. However, the jury verdict does require the inference that the officers were not, at the time of the killing, lawfully discharging a duty imposed by law. It was undisputed that Dallas resisted Pogue and Elms. In order to acquit Dallas of the resisting officers charge, the jury *had* to have determined that Pogue and Elms were not acting in the course and scope of their employment as peace officers. Moreover, Dallas was charged with first degree murder on the theory that he had killed *peace officers.* The jury *had* to resolve the issue of whether Pogue and Elms were lawfully discharging a duty imposed by law, and hence, acting as peace officers at the time of the killing in order to return a verdict on that charge. Because the jury did not convict Dallas on the charge of first degree murder on the theory that he had killed peace officers we *must* infer that the jury concluded that Pogue and Elms were not, at the time of their death, acting as peace officers.

Hence, the district court's remarks about harsher sentences for those who kill peace officers were completely inappropriate following a verdict wherein the jury necessarily determined that the victims were not, at the time of the killing, peace officers.

The majority relates that a trial judge has access to a broad range of information prior to announcing sentence and that often the information available to a judge will include facts not presented to the jury. While this statement is true it has no relevance in *this* case because nowhere in the sentencing record was additional evidence submitted on the precise issue of whether, at the time Pogue and Elms were killed, they were acting as peace officers. Hence, as to *this* issue, the court had no information that had not been presented to the jury. The jury had heard the witnesses, ascertained their credibility or lack thereof, and had weighed the evidence. In so doing, the jury necessarily made factual findings in support of the verdict. There is simply no basis in law or reason for the district court to impose a sentence based on the *court's* factual determination that Pogue and Elms. were, at the time of the killing "peace officers," when such finding was contrary to that reached by the jury. For that reason, I would remand the case to the district court for resentencing with instructions that it not consider the victims to be "peace officers" for the purpose of imposing a harsher sentence on the defendant.

I strongly dissent to part III of the majority opinion wherein the majority refuses to overrule the trial court in its failure to fully compensate Mr. Mauk for his reasonable attorney's fees, which compensation would require the payment of an additional

$4,000.00 to him. The trial was not only lengthy but exceedingly complex; one attorney could not reasonably be expected to present the defense; and, had Mr. Mauk not been willing to assist at trial without advance promise of payment, we may well have been faced with a situation requiring reversal and retrial because it is unlikely that just one attorney could have furnished Dallas with effective assistance of counsel. As judges receiving a monthly paycheck and having no office overhead, we easily forget the economics of operating a law office. Mr. Mauk rendered a great service not only to his client but to the judicial system; he billed his services at $30.00 per hour which is less than one-third of the prevailing rate for attorneys of his experience conducting a trial of this magnitude. Although he billed at less than one-third the going rate, he was paid only half of the amount billed, which compensation provided him $15.00 per hour against services which could reasonably have been charged at $75.00 to $100.00 per hour.

Studies reflect that the overhead expense of a typical Boise lawyer in a small firm charging $75.00 per hour is $55.00. Thus, when compensated at $15.00 per hour, Mr. Mauk was likely *losing* $40.00 per hour for his necessary efforts on behalf of his client and in furtherance of our system of criminal justice. Superimposed upon that loss is the fact that while one is engaged in a major trial there are substantial periods during both trial preparation and trial itself when the lawyer must focus exclusively on the case at hand. Hence, the lawyer may have to turn away other clients whose concerns require immediate legal attention. Thus the attorney also loses future clients because of a willingness to represent a criminal defendant. Trial judges may curry favor with taxpayers and county commissioners when they award fees at less than a subsistence rate, (and indeed they should strive to achieve economic efficiency), but it is a false economy that compensates attorneys so little as to destroy the effectiveness of counsel and the quality operation of our criminal justice system.

Both trial and appellate judges must become more aware not only of the economics of legal practice, but of the indispensable service the criminal defense bar renders which is fundamental to our system of government. We do our system great and lasting harm when, as here, we grossly under-compensate counsel.

BISTLINE, Justice, concurring in the opinion of HUNTLEY, Justice.

As I have always thought, and on occasion remarked, historically Idaho's district judges, have been leaders in their respective communities. Presently they are the only local judges who truly are of the people, by the people, and for the people. Since so-called court reform some few years back, county judges no longer exist. Other than for district judges, under Idaho's novel system, commissions have been established to select for local people those who will judge them. With such thoughts in mind and with a strong perception that the district judge in this case sincerely believed that his sentencing of Mr. Dallas reflected what he knew to be the mores and temperament of his community, my vote nevertheless must be cast to join the views expressed in Justice Huntley's opinion.

Inherent in any jury verdict are certain factual determinations which necessarily had to have been made. When those facts have once been determined by a jury, a jury under our system being the ultimate finder of fact, it simply cannot be that the presiding judge can at sentencing find his own facts which are at variance with those of the jury.

I am not unaware that Justice Bakes for a majority of three has concocted the philosophy now guiding the Court that a trial judge can base his sentencing findings on an access to a broad range of information to which the jury did not have access in returning its verdict, whereby Justice Bakes has been able to hypothesize that "the findings of the jury, and the findings of the trial judge, are not inconsistent; rather, they are based on different ranges

of information." *State v. Sivak*, 105 Idaho 900, 907, 674 P.2d 396, 403 (1983). That philosophy is as dangerous to a fair administration of criminal justice as any doctrine heretofore conceived, of which I naively hoped to convince the *Sivak* majority. 105 Idaho at 917, 674 P.2d at 413. The passage of time and our review of additional similar cases has only served to heighten my concern. On that day in Idaho when the sentencing judge is allowed to hear and consider *no* evidence that would not be admissible in *a court of law*, to not coin a phrase, but meaning admissible in a jury trial, that will be a happy day. To those who are new to the practice of law in Idaho in the past three years, or who have not felt enough concern to have done so, I commend a reading of *State v. Moore*, 93 Idaho 14, 454 P.2d 51 (1969), and also *Sivak, supra*, 105 Idaho at 920, 674 P.2d at 416, where is explained the history of how the holding of that case, of benefit to defendants, has become distorted into an instrument to be used against them.

On the matter of attorney's fees, I am surprised that the majority makes no response to that which Justice Huntley has written suggesting that Mr. Mauk has been grossly under-compensated. On that score I add only that on other cases before us I have suggested that the legislature has mandated that an indigent have the same representation that he would have were he not pecuniarily disadvantaged. Without looking back, I may have suggested that in any capital case there should never be the occasion when a single practitioner is obliged to carry the awesome burden of defending in capital cases. It is too much responsibility, and many courts in other jurisdictions have recognized this. There is also reason to believe that the need for at least two counsel to shoulder the responsibility has been recognized in Idaho since early times. One would like to think that a statute which has been on the books for 121 years might have some persuasion in this area of the law. I refer to I.C. § 19–2103, which provides:

> **Argument to jury.**—If the indictment is for an offense punishable with death, two (2) counsel on each side may argue the cause to the jury. If it is for any other offense, the court may, in its discretion, restrict the argument to one (1) counsel on each side.

Most obviously, even before statehood and afterward, it was understood that no person would ever be defended in a capital case with less than two counsel. I suggest that if you will bring to me an attorney from the ranks who will knowingly and voluntarily endeavor to single-handedly represent such a defendant, I will show you a person who has not acted intelligently. For my part, I would not hesitate to refuse an appointment to be sole counsel for a person charged with an offense punishable by death. To so proceed would, in my humble opinion, be tantamount to furnishing the accused with the immediate means of his self-destruction. Mr. Mauk obviously played a significant part in the defense of Mr. Dallas, and he should be compensated accordingly. That he will not be is something he can no doubt live with, but I do not believe the judicial system should be sent the message which the majority this day transmits.