815 P.2d 453

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Miguel Acuna ROMERO, Defendant–Appellant.**

**No. 18491.**

Supreme Court of Idaho.

Aug. 30, 1991.

Whittier, McDougall, Souza, Murray & Clark, Pocatello, for defendant-appellant. Isaac McDougall, argued.

Jim Jones, Atty. Gen., Lynn E. Thomas (argued), Deputy Atty. Gen., for plaintiff–respondent.

### DISSENT ON DENIAL OF PETITION FOR REVIEW

BISTLINE, Justice, dissenting from the denial of the petition for review.

### PART I.

Miguel Romero was charged with first degree murder, but the jury, after hearing the evidence and being instructed on the law by the court, found he was only guilty of the lesser included offense of voluntary manslaughter. The trial court, Judge Hargraves presiding, imposed a 15 year fixed sentence, the *maximum* allowed by law. I.C. § 18–4007.

This Court on an earlier review of the case vacated the imposition of that sentence because the trial court refused to order a pre-sentence investigation report notwithstanding a request for one by defense counsel. *State v. Romero*, 116 Idaho 391, 397, 775 P.2d 1233, 1239 (1989). The facts of the case are set out in that opinion. 116 Idaho at 393, 775 P.2d at 1234. Some facts, however, bear repeating.

First, it is clear that drinking was involved. Thompson, who died from his injuries, had a blood alcohol level of .10, and it was Thompson who instigated the confrontation by making a gesture at Jerry Griffith which the latter was willing to fight about. Griffith and Romero had also been drinking. The trial testimony of the witnesses makes clear that Romero went to the aid of Griffith when it appeared that the larger Thompson (6'2", 240 lbs) and Griffith might fight. Romero is 5'9" and weighs 160 pounds. One witness said that Romero tried to stop the fight between Griffith and Thompson. One of the state's own witnesses testified that Thompson struck first, hitting Romero in the eye, causing Romero to bleed badly. According to emergency room hospital records, Romero's left eye was still swollen shut eleven hours after the fight. And finally, although in retrospect it is clear that Romero and Griffith should not have kicked Thompson once he was knocked down, it is highly likely that Griffith inflicted the deadly blows with his boots, not Romero who was wearing tennis shoes.

Upon remand by this Court, a different district court judge ordered a pre-sentence report and presided over a new sentencing hearing. The report provides the following information: Romero had just turned twenty years old at the time the offense occurred. He was born in Mexico, one of ten children. Because of his citizenship, the Immigration and Naturalization Service has placed a detainer on Romero and he will likely be returned to Mexico whenever he is released from the penitentiary. Romero has the equivalent of an eighth grade education. He left home at fourteen to find work. Prior to his arrest on this charge, Romero had never been convicted of, or even arrested for, a felony offense. His prior criminal record consisted of four insignificant misdemeanor convictions, probably attributable to being a juvenile without parental support or supervision, for which he was fined a total of $139.50.

No jail time was imposed for any of these minor offenses.

The presentence report also shows that Romero has voluntarily enrolled in school while in confinement and has kept a good attitude about school even after his disappointment with his resentencing. He is eager to learn and helps other Hispanic inmates with their lessons. Unfortunately, he is hindered by a learning disability. The staff psychologist concluded that Romero has a neurological defect, but further testing has been impossible due to a lack of equipment and money. He has been active in intramural sports and gets along well with both the other inmates and the officials.[1] A volunteer from the Church of Latter Day Saints reported that Romero has been an active participant in their religious education program. To the volunteer, Romero expressed remorse for his participation in the Thompson–Griffith episode.

## PART II–A

At the resentencing hearing, which as a matter of convenience was held at the state penitentiary south of Boise, it was not the Bannock County Prosecutor who appeared on behalf of the State, but the Solicitor General, Lynn Thomas, whose prior participation in criminal cases, to my knowledge, has been at the appellate level, either in the Court of Appeals or in this Court. The record suggests that an arrangement was made for him to be appointed as a Bannock County Deputy Prosecuting Attorney. As Solicitor General he represented the State and delivered the State's argument on appeal. 116 Idaho 391, 775 P.2d 1233 (1989). He had also represented the State in the earlier argument to the Court of Appeals. 114 Idaho 92, 753 P.2d 828 (Ct.App.1988). The Solicitor General has, as a matter of course, presented the State's case in many of the most important criminal cases, both orally and in the briefs, which ordinarily are capital cases. His capabilities as an

---

**1.** The Solicitor General produced two penitentiary guards who testified that they would not trust Romero, which was their opinion, and

hence not open to impeachment, and which also would have made it highly imprudent to make the attempt.

advocate are beyond question; he is articulate and persuasive.

With such thought in mind, it is observed with interest and disappointment that the Solicitor General, in acting as Bannock County's legal representative in the case at bar, presented an argument which denigrated the Bannock County jury which was impaneled approximately five years ago to hear the State's case against Miguel Romero. The following is his argument, with pertinent presentation emphasized:

THE COURT: Thank you, Mr. Thomas. You may proceed.

MR. THOMAS: *There are a few things that we need to start with here. We don't really start at the beginning of anything at this point. First of all, the defendant in this case was charged with murder in the first degree. If this case were before an appellate court on the record of this case and this defendant had been convicted of murder in the first degree and had been sentenced to death, which is the possible penalty under Idaho law, there is virtually no question that the Court would find the evidence sufficient to support that conviction and would find that the facts and circumstances of this case justified the imposition of the death penalty under Idaho Code Section 19–2515.*

*So Mr. Romero doesn't start out here with any greater sentence than should have been imposed for his crime. He starts out here having received a windfall conferred upon him by a jury, who acted for whatever reason none of us will ever know, in acquitting this defendant of the crime of murder in the first degree and convicting him only of voluntary manslaughter. So he doesn't get the death penalty all the evidence would have justified.*

. . . .

*And one would expect that the, that the worse the example of voluntary manslaughter should be reserved for the higher penalty, the fixed maximum term. Well, this is an example of voluntary manslaughter that, in fact, was a murder in the first degree that would have justified the death penalty and in which the death penalty would probably have been upheld had it gone through the appeals courts.*

Mr. Jarman argues, as I understand him, that somehow or other the Supreme Court casts doubt in its decision in this case on the merit of a fixed-term sentence in these proceeding. That's not the way I read the Court's decision. The Court did not decide the sentencing questions that are here today. This case wouldn't have come back here for a resentencing if the Supreme Court had decided that a fixed-term sentence was too great. We'd have been told that. We weren't told that. That's not what the Court said. The Court said take this back, get the rest of the facts that may have been left out because a presentence report was not ordered, and impose sentence again.[2]

There isn't any difference in the culpability of Jerry Griffith and Miguel Romero. Mr. Griffith argued in all of his appeals proceedings that this defendant was the real culprit and he, Griffith, was the innocent bystander who shouldn't have been convicted or punished for anything.

Now, I would simply call the Court's attention to the, the principles of law that govern sentencing within the statutory limit. First of all, the Court is asked to protect society by the sentence it imposes, and here is a defendant who intercepted an innocent passerby on a public street and kicked him to death. There isn't any question that society

**2.** The Solicitor General intimated to the trial court that this Court, if it viewed the fixed fifteen year sentence as being too severe for a conviction of voluntary manslaughter, would have reduced the sentence. To do so is clearly within the authority of the Supreme Court, and the Court as differently constituted has done so in the past. It has been my observation that the Court generally has avoided modifying sentences, and presumes that the district courts, in their exercise of a sound judicial discretion, will not perform the sentencing function arbitrarily or capriciously.

needs some kind of protection from that kind of behavior.

What we have in these circumstances are claims against the facts of the case, that Mr. Romero has recommendations, that he has attempted to rehabilitate himself. Well, the fact of the matter is that the, the defendant's attendance at school and his church attendance and the other things he has done to create the impression that he's a good guy are pretty late in coming. They don't cancel out what he did in the commission of this crime, and they didn't even happen here in the prison till after Mr. Romero began going on his appeals proceedings.

I would suggest to the Court that the rehabilitative behavior of prisoners who are trying to obtain relief in the appeals process or in the habeas corpus process is not especially believable. You see this every day in every case. The prisoner comes forward and says "I'm going to school in the penitentiary. I'm going to church. I have apologized to the people I hurt." It happens in every case where anybody is counseled by a halfway qualified law library lawyer over here, and those representations do not mean a thing in the context of what has happened in this case.

*This is a case of a cold-blooded first degree murder, and this Court would not be protecting society if it imposed less than a fixed 15-year term.*

What's the defendant done, by the way, to demonstrate that somehow or other he is amenable to rehabilitation? He hasn't demonstrated it in his behavior in this institution. He's uncooperative. He is an aggressive troublemaker. He is not trusted by the guards who exercise supervisory authority over him.

And significantly enough, Mr. Romero told us just what he thought of the laws of this country by his very first act. He is an illegal alien in this country. His first step over the border into this country is a violation of the laws of the United States. The first thing he did was to scoff at our law. And now he wants us to believe that somehow or other he is ready to go back out into society at some time in the near future—and it will be the near future if a fixed sentence is not imposed—and to behave there as a law-abiding and productive citizen. That can't be believed in the facts and the circumstances of this case.

These letters that the Court has before it are something less than entirely persuasive. One of Romero's teachers a long time ago, by the way, before he had reached adulthood, says nothing more than this: The student, Miguel Romero, was enrolled during the years 1974 and 1975 in elementary school and during that time, he showed good conduct.

There isn't anything in these letters that tells us anything about the recommender's knowledge of Romero's present conduct. They essentially are concerned with times long passed when Romero was much younger. And they're not effective, or they're not persuasive in suggesting to the Court that Romero has made a showing that he is ready to take his place in society.

But even if they did, the important thing is this, as far as the law of this State is concerned: This crime requires the Court to announce society's condemnation of it by the maximum possible sentence that can be imposed for voluntary manslaughter. To do otherwise is to depreciate the crime in the public eye, and that undermines public confidence in the law. The Court should not follow that path here.

The Idaho Supreme Court, in its decisions dealing with sentencing processes and procedures-and sentencing principles, has said that a sentence can be imposed for any of the various reasons for imposing a sentence—retribution the protection of society, deterrence. Any of those factors standing alone is an appropriate factor to consider at sentencing.

Even if the defendant came in here with persuasive unrebuttable evidence of present good character and that he had been rehabilitated, the Court could not properly impose less than a fixed maximum sentence and still discharge its obligation to protect society and to announce

to criminals at large that this kind of conduct will not be tolerated. The sentence imposed in this case the first time around was the proper one, and it's the sentence the Court should impose now.

Tr., 100–106 (emphasis added).

## PART II-B

There is no doubting the Solicitor General's speaking ability and his powers of persuasion, even over one of Idaho's most outstanding district judges. Shortly thereafter, and during the same hearing, with the ring of the Solicitor General's clarion sounds still in the air, the court imposed sentence, but first made comments which reflected the influence of the oral argument of the Solicitor General:

THE COURT: Mr. Romero, this crime leaves one truly speechless ... and I think the jury verdict, at least, suggests that the jury felt that perhaps you were involved in some type of a heated altercation, *which was at least not of your own making.*

. . . .

I would comment that if there ever was an act of voluntary manslaughter which justified a maximum fixed sentence as punishment, I think the *senseless murder* of Bob Thompson is such an act; and that under those circumstances, the information which I have received, although indicating some redeeming characteristics in your personality, is simply not enough to overcome that crime.

I'm sure, as you stand there today, you would give anything to go back now, what, almost three years or over three years and undo what occurred; but that's the human condition that we don't have that opportunity. And so you and I must deal with the real world as it now is. And that requires that I must impose a sentence, and you must serve a sentence.

I would also comment, in terms of the goals which we are trying to achieve here, that the protection of society in and of itself justifies the type of sentence which Judge Hargraves imposed. But in addition, I think in terms of deterrence, both for you and for others who might be involved in a similar situation; in terms of society's need in some circumstances to have retribution—that all of those justify the type of sentence which was originally imposed here. And I simply find nothing in the presentence report which would modify or justify a change in that conclusion.

Tr., 104–112 (emphasis added).

Is the Solicitor General a skilled and capable advocate? The answer is found wherein the district court described the death of Bob Thompson as a *senseless murder,* when in actuality the jurors who heard the witnesses and assessed credibility unanimously found Romero guilty of only voluntary manslaughter.

## PART III

Persuaded by the Solicitor General, the trial court imposed the same 15 year fixed term sentence which had been imposed by Judge Hargraves, who did not have the benefit of a presentence report, and who, in violation of I.C.R. 32, did not state reasons for not ordering one. This second sentence was also affirmed by the Court of Appeals.

Romero argues that the court imposed the harsh sentence in part because it disagreed with the jury's voluntary manslaughter verdict, contending that it was improper for the judge to substitute his judgment for that of the jury. There is evidence to support that argument. The judge, as noted above, referred to the offense as a "senseless murder." Manslaughter, of course, is not the same thing as murder, but rather is two tiers below the first degree murder charge alleged by the prosecutor. Moreover, the state, both at the resentencing and earlier on the appeal, argued that it was proper for the second judge to impose the maximum sentence in order to counteract the "erroneous" jury verdict. In his brief, the Solicitor General hypothesizes that the verdict was the result of an "erroneous instruction" given to the jury, or that the jury was "afloat" in "watery sentiment," or that the jurors were "stupid." It is suggested, however, that better he would recognize that the verdict was

twelve local jurors' assessment of Romero's culpability based on the evidence which had been presented.

The parties, however, have not alerted us to any case wherein we have directly addressed the issue presented by Romero. *State v. Dallas*, 109 Idaho 670, 675, 710 P.2d 580, 585 (1985), cited by the state, is inapposite. There, the judge had evidence at the sentencing hearing which the jury did not have. Here, the judge was persuaded to view the evidence at trial differently than the jury. Additionally, it was not at all clear in the *Dallas* case that the judge's view of the evidence was at odds with the jury verdict. Here, it is clear that the judge was overwhelmed, temporarily at least, by the Solicitor General's rhetoric to the point that he described the voluntary manslaughter as a murder, and perhaps believed that Romero should have been convicted of murder, not manslaughter, and for that reason exercised a misguided discretion. Justice O'Connor recently noted that "[i]f, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing procedure as to render it fundamental unfair, the defendant may seek relief under the Due Process Clause of the Fourteenth Amendment." *Payne v. Tennessee*, 498 U.S. ——, ——, 111 S.Ct. 2597, 2612, 115 L.Ed.2d 720 (1991) (O'Connor, J., joined by White, J. and Kennedy, J.). We should grant the petition to decide this important question of law. Moreover, this Court, rather than just this one member thereof, should put an end to such rhetoric which urges a district court to ignore the verdict of a jury.

We should grant the petition in order to review whether the punishment imposed was excessive in light of the circumstances of the case and in light of the objectives of criminal punishment. *See State v. Nice*, 103 Idaho 89, 90, 645 P.2d 323, 324 (1982) and *State v. Dallas*, 109 Idaho at 674, 710 P.2d at 585. Romero argues persuasively that an indeterminate sentence would better serve the purposes of rehabilitation by providing the possibility of parole as an incentive to improve himself. Moreover, as previously noted, the possibility of an earlier release would not significantly affect public safety because it is highly likely that Romero will be sent back to Mexico upon release. Thus, modification of his sentence would also encourage the frugal use of scarce state monetary resources. Finally, the purposes of general deterrence have already been served by the imposition of the same 15 year fixed sentence upon Romero's co-defendant. That sentence was unanimously affirmed by this Court in *State v. Griffith*, 116 Idaho 173, 774 P.2d 343 (1989).

In light of the additional evidence presented to it in the presentence report, it is difficult to understand why the court below imposed the same sentence this Court earlier vacated. Perhaps it felt obliged to reaffirm the sentence imposed by Judge Hargraves, since deceased. Its obligation, however, was to resentence Romero consistent with the laws of this state.

Today this Court ought not to allow itself to be seen as shrinking from its obligation to hear and have the final say in this case by refusing to review the propriety of the 15 year fixed term sentence imposed upon Romero. We should grant the petition for review to at least consider modifying the sentence from a fixed term to an indeterminate term. In two months, Romero will have served five of the fifteen years dealt him. If deterrence was an objective of Judge Hargraves, or for the judge in the recent resentencing, that purpose has already been well served. It is not within reason to expect that there are many, or even any, persons in Idaho who are going to be dissuaded from being drawn into an ongoing brawl by their knowledge that Miguel Romero is going to be confined for another ten years.

Perhaps that desired effect could be achieved if the Solicitor General were to run daily or, at the least, weekly newspaper articles reporting that Romero is still being confined for his participation in a "heated altercation which was at least not of his own making." Then, and only then, might the deterrence effect of the sentence have some helpful influence on some present day immature juvenile, who has

come into Idaho seeking work. All of which does not even take into account the cost to the Idaho taxpayers of housing and feeding a twenty-five year old person well able to be of support to himself and his family in Mexico.

In sharp contrast to the Solicitor General's repeated portrayal of Romero as a murderer who should be executed, there is the commendable argument made by Mr. Jarman, court appointed counsel, who has given faithful representation to Romero. Mr. Jarman's remarks, none of which involved any rhetoric such as the trial court heard from the Solicitor General, were rather moderate but eloquent reasoning for not locking Romero up for fifteen years without any hope for parole.

MR. JARMAN: Well, Your Honor, let me just make an observation: That Mr. Romero's efforts at self-improvement began well over a year ago after he had heard from me that the Court of Appeals had rejected any, any effort at getting this thing returned for a resentencing. And he was also advised by me that the chances certainly could not be counted on, that he had to make his own way the best he could. I do not think he undertook these steps in—with really any particular hope that things would change. He did them because he's the kind of person he is.

Your Honor, I've had both the privilege and burden to defend murder charges, three or four. It, it troubled me greatly and it troubles me right as I stand here today that we can use, as was done in this particular case, the change of our sentencing law, which has been— Mr. Romero finds himself in the unique circumstance of having good time abolished and yet not having the availability of the new sentencing law, which would fix a minimum term of custody and give him at least some eligibility for parole.

As a person who has represented people convicted of first degree murder and seeing such persons released on parole before my client ever even has a prayer to get out, I'm deeply troubled. I'm troubled as to consistency in the law. What consistency is there if a person can be found guilty of murder and exit the institution before a person who goes before a jury and successfully convinces that jury that he's not a murderer?

I think that is the key distinction that should cause Miguel Romero's sentence to be different than Mr. Griffith's and, as a practical matter, different than Mr. Beltran who received a fixed 15. He used a gun, and it was a woman, and he was allowed to plead guilty. I think that's a major distinction.

I had no part in the prosecutor's decision to permit Mr. Griffith to plead to manslaughter. The Court should recall there wasn't a mark on Jerry Griffith after this event. But Mr. Romero was in a sudden quarrel. He demonstrated that to a jury, and he should have the benefit of the jury's determination that he's redeemable.

I think the jury verdict in his favor is a key distinguishing factor, along with a vastly different characteristic than Mr. Griffith; but the fact that the jury found in his favor this was not a murder, and so concluded, that he should have the benefit of that jury verdict. And the only way to have benefit of that jury verdict is to be given the opportunity for parole, and that's all we ask at today's hearing.

Tr., 107–08.