# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 44858

STATE OF IDAHO, )
)
    Plaintiff-Respondent, )
)
v. )
)
JASON ANDREW GODWIN, SR., )
)
    Defendant-Appellant. )
)

Boise, January 2019 Term

Opinion filed: March 14, 2019

Karel A. Lehrman, Clerk

Appeal from the District Court of the Second Judicial District, State of Idaho, Idaho County. Hon. Gregory FitzMaurice, District Judge.

Conviction for second degree murder, affirmed.

Eric D. Fredericksen, State Appellate Public Defender, Boise, for appellant. Jenevieve C. Swinford, Deputy Appellate Public Defender argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. Kenneth K. Jorgensen, Deputy Attorney General argued.

_____

BURDICK, Chief Justice.

Jason Andrew Godwin, Sr., appeals the judgment of conviction entered against him in Idaho County district court for second degree murder. Godwin was convicted in February 2016, for the killing of Kyle A. Anderson on June 9, 2014. In his appeal, Godwin asserts that the district court erred by denying his motion to suppress evidence of statements he made to police. Godwin also contends that the district court erred by requiring him to show personal knowledge of Anderson's violent or aggressive character before allowing him to present evidence of that character. Godwin also asserts that the district court failed to properly instruct the jury on justifiable homicide under section 18-4009 of the Idaho Code. Godwin further argues that the State committed prosecutorial misconduct by impermissibly vouching for evidence and witnesses in closing arguments. Lastly, Godwin asserts the complained-of errors in his case, even

1

if harmless individually, amount to a due process violation when viewed cumulatively. We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Around 10:00 p.m. on June 9, 2014, Godwin shot and killed Anderson at a motor-vehicle pullout off of Toll Road just outside Kooskia, Idaho. On February 26, 2016, after a five-day trial, a jury delivered a guilty verdict against Godwin on the charge of second degree murder.

The day before Anderson was fatally shot, Godwin attended a barbeque with Phyllis "Carla" Griner, James Robinette, and Ernest "Ernie" Ruiz at which Robinette informed Godwin that he suspected that Anderson had stolen some guns from him. The next morning, Godwin, Ruiz, Brandy Lilly, and Beau Lynch, traveling in the same vehicle, went to look for the guns underneath an overturned boat in a nearby canyon but were unable to find them. Afterwards, Godwin dropped off the passengers and ran a few errands around Kooskia. Eventually, he picked up Lynch and the pair drove to Robinette's property to go shooting.

At Robinette's property, Godwin and Lynch met up with Robinette, Ruiz, and a few others. The group again discussed their belief that Anderson was in possession of Robinette's stolen firearms. At some point, either Robinette, Griner, or both, informed Godwin that Robinette's father was offering a $500 reward for the recovery of the guns. Godwin agreed to take Ruiz to retrieve the guns from Anderson.

At that time, Anderson lived with his girlfriend, Amanda Jones, in a large motorhome parked on a pullout along the Clearwater River about a half mile outside of Kooskia. Anderson also had a small Geo car parked on the pullout. That night, Anderson's son, Joseph Anderson, was also staying at the trailer.

After leaving Robinette's property, Godwin ran a few other errands, but then drove towards the pullout. In his vehicle, Griner sat in the passenger seat, Ruiz sat behind Griner in the back passenger seat, and Lynch sat behind Godwin in the driver's side backseat. Seeing that Anderson's car was parked by the motorhome, Godwin passed the pullout without stopping. He drove back to town until eventually circling back to the pullout and pulling up to Anderson's motorhome.

The events that followed were contested at trial. A balance of the testimony showed that Godwin pulled up while Anderson and Jones were outside and Joseph was inside the motorhome. At some point thereafter, Godwin shot Anderson through the neck underneath his

2

chin from a distance of six inches to two feet. The bullet passed into Anderson's spinal cord, impacted the back of the vertebral column completely transecting the spinal cord and immediately causing Anderson to drop. An autopsy would later show abrasions over Anderson's back and right shoulder consistent with someone having dragged him by his feet. Eventually, however, Anderson's body came to rest on the gravel next to his motorhome.

Many things happened after the shot was fired. Lynch darted from the car and made his way along the highway back to Kooskia. Jones alleged that Godwin aimed his gun at her and demanded to know where the guns were located; however, she was able to break away and lock herself in the motorhome with Joseph. After Anderson's gun was obtained by either Godwin or Ruiz, Godwin then drove his car, with Griner and Ruiz inside, back towards Kooskia. Almost immediately after getting back on Toll Road, they passed the on-duty Deputy Keith Olson of the Idaho County Sheriff's Department driving a Sheriff's Department truck featuring a large logo on the side. No one in Godwin's vehicle attempted to flag down Deputy Olson's vehicle.

Deputy Olson then passed Jones who was driving Anderson's small car as he patrolled up Toll Road. Seeing that Jones had both hands out the window in an attempt to flag him down, Olson stopped to speak with her. He then called for an ambulance and followed her to the pullout. Upon arrival, Deputy Olson discovered Anderson's body, cancelled the ambulance, radioed dispatch for additional officers, and secured the crime scene.

Later, Corporal Randy Long, Detective Brian Hewson, Lieutenant Doug Ulmer, and Lieutenant Jerry Johnson arrived on the scene. While Detective Hewson investigated the crime scene, Lieutenant Johnson took Jones and Joseph to the Kooskia Sheriff's Office for interviews. After identifying some people of interest, Lieutenant Ulmer went to Godwin's unoccupied trailer. There, he noticed the trailer had been left in disarray. Rifles and an overturned gallon of milk had been left outside the front door and a plastic grocery bag of prescription pills lay in the middle of the lawn. After receiving Godwin's phone number from dispatch, Lieutenant Ulmer called Godwin at around 3:00 a.m. on the morning of June 10. When Godwin answered, Lieutenant Ulmer asked him where he was. Godwin said he was at home. Lieutenant Ulmer advised Godwin that he was at Godwin's trailer home. Godwin then informed Lieutenant Ulmer that he was in Dudley, Idaho, and had left the Kooskia area around noon the day before. Lieutenant Ulmer told Godwin that he wished to talk to him in person, asked him to get in touch with the sheriff's office, and ended the call.

3

At about 8:00 a.m. on the morning of June 10, Godwin called Lieutenant Ulmer and informed him that he was on his way back to Kooskia and wanted to know where he could meet with him. Lieutenant Ulmer told Godwin to meet him at the Kooskia Sheriff's Office. Instead of Lieutenant Ulmer, however, Detective Hewson met Godwin when he arrived and the two went to a conference room for an interview.

Upon initial questioning, Godwin told Detective Hewson that he had been up in Dudley, Idaho, the previous day. Detective Hewson asked Godwin if he knew why they wanted to talk to him. Godwin replied that Lieutenant Johnson had told him that Anderson had been murdered, but claimed he didn't know who Anderson was. After Hewson told Godwin that people had seen him in the Kooskia area past the time Godwin said he left, the following exchange occurred:

> Q. Okay. Well, there's people that definitely saw you here at 7:00 last night.
>
> A. (Inaudible). No, wasn't here at 7:00.
>
> Q. There's people that saw you at the trailer at 7:00, Jason. That's what I'm talking about.
>
> A. (Inaudible).
>
> Q. I'm not trying to ride you, please.
>
> A. Okay.
>
> Q. Okay. I don't like treating people like that, but you got to kind of understand what I am—
>
> A. They're trying to accuse me of shooting this guy or (inaudible)?
>
> Q. They are saying that, yes, something happened between you and him, and it was more or less an accident. And that's all we're trying to get cleared up. If something happened between you guys and it was an accident, I wish that you would talk to us about it.
>
> A. Fine. Pulled up there and—
>
> Q. What time?
>
> A. — the guy pointed a gun at me, and I grabbed my gun and shot him.
>
> Q. Okay.
>
> A. And then I left.[1]

---

[1] The transcript of this interview was created by the district court's reporter for purposes of the suppression hearing. After it was created, the parties were given a chance to object, and the court settled the transcript as filed on September 24, 2014. At the trial, the jury listened to the interview but was not given a transcript. This opinion quotes the transcript settled by the court.

Hewson asked follow-up questions, prompting Godwin to reveal more details about the shooting during which Godwin reaffirmed the shooting was in self-defense. Godwin also informed Hewson that he had taken the gun Anderson threatened him with and hid it in his trailer along with the firearm Godwin had used to shoot Anderson. Detective Hewson then decided to read Godwin his *Miranda* rights prompting the following exchange:

A. I know I ain't supposed to say nothing. I put vows to not say nothing to him, but, you know, like I told everybody, it was self-defense. I told Carla. They seen him pull a gun out.

Q. Yeah. Well, have you ever had your rights read to you, your *Miranda* rights? Because I'm going to do that anyway.

A. Are you going to arrest me?

Q. I don't make those kind of decisions, okay. I probably won't arrest you. That doesn't mean that somebody else like Jerry or somebody might, but I'm just telling you right out of the gate that it looked or sounded to me like a scenario that happened—

A. (Inaudible) drug dealer, and Ernie was going to rip him off. That's all I know.

Q. It sounded like a scenario to me that happened; that it wasn't meant to happen. Somebody didn't go out there just to kill a man, you know. That's what it looked like to me, okay.

A. Well, he pointed the gun at me, and that's when I shot a guy — shot. That's all there is to it.

Q. Yeah. Let me see if he has a rights waiver. You should know your rights.

A. (Inaudible) my rights?

Q. Pardon me?

A. (Inaudible) waive my rights?

Q. No. I'm going to read you your rights. That's what I'm going to do. I'm going to see if one of these guys has—

A. You shouldn't be reading it to me after I already said something.

Q. I didn't have to read them to you to begin with, and I still don't, because I would have to read you your rights if you were under arrest and then I questioned you. You weren't under arrest or detained at the time I— that we started talking. I just want to make sure that you know—do you have a rights waiver, just a *Miranda* warning?

SPEAKER: Yeah, yeah. Let me go grab it.

Q. (By Mr. Hewson) All right. Thank you.

5

A. Yeah, I screwed up, but self-defense. That's all there is to it.

After a few more questions, Detective Hewson read Godwin his *Miranda* rights:

Q. . . . *Miranda* warning is what this is. I want to make sure you know what your rights are. You have a right to know, right. If I can read it.

A. I'm sorry, Augie (phonetic), but I ain't an attorney.

Q. I get it, and I knew you did, okay. That's why I wanted to keep giving you—but let's try again. I'm going to read this.

A. (Inaudible) my life.

Q. Pardon me?

A. I never had—did anything like in any point in my life, and he's pointing the gun right at my head, pretty close.

Q. Let me read this to you, okay. You have the right to remain silent when questioned. That's pretty self-explanatory, right? If you choose to answer questions, statements you make can be used against you in a court of law. I said, they can be. You have the right to an attorney before and/or during questioning. If you are unable to afford a lawyer and if you need one, one will be appointed to you by the Court. And he's a good lawyer. I know him. Do you understand those? And you can stop talking to me, Jason, anytime you want, okay?

A. I may have to.

Q. But as—as like we started out, you didn't start down a good—

A. (Inaudible). A guy gets hisself (sic) in a situation. I really didn't mean to get in that situation.

After more questioning, the interview was paused for Hewson to speak with his supervisor and Godwin took a cigarette break. Godwin also gave his consent to search his trailer to recover his gun and the gun taken from Anderson. The entire interview lasted a little less than an hour. Elsewhere, at the same time of Godwin's interview, Lieutenant Ulmer conducted a photo identification line-up with Jones in which Jones was unable to positively identify Godwin as the shooter. At the end of Godwin's interview, Detective Hewson spoke with Lieutenant Ulmer and a county prosecutor and, at the conclusion of the discussion, the decision was made to arrest Godwin and place him in handcuffs. Later the following day, upon the issuing of a warrant, the guns were recovered from a storage space under the bed in Godwin's trailer.

On June 24, 2014, the State filed an information against Godwin alleging murder in the second degree. Godwin pleaded not guilty and filed a pretrial motion to suppress his statements to Detective Hewson. Godwin argued that the statements were involuntary and he had invoked

6

his right to counsel and refused to waive his *Miranda* rights. The State objected. After holding an evidentiary hearing, the district court denied the motion.

A few weeks prior to trial, on February 10, 2016, the State filed a motion in limine seeking to have the court prohibit two proposed defense witnesses from testifying about "specific instances of conduct showing that [Anderson] was violent and aggressive." Both witnesses were expected to testify that Anderson had pointed a gun at them on prior occasions. The court did not hear argument on the motions until the afternoon of the second day of trial—after jury selection and voir dire, but before opening statements. In argument, the defense acknowledged that binding case law did not support their position, but argued that the court should nevertheless admit the testimony about the specific acts and overrule the contrary authority. The defense pointed to significant similarities between the proposed testimony and Anderson's alleged conduct on the night of the shooting. Unpersuaded, the court orally ruled that specific instances of conduct were inadmissible for the defense's proposed purpose but also commented that the defense may produce reputation or opinion testimony with proper foundation. The following morning, the court filed a written order granting the State's motion on the specific–act evidence. The order noted that reputation or opinion evidence would be allowed, but did not impose a foundational requirement.

During its case-in-chief, the State called Jones, who testified as follows. Anderson was putting license plates on the motorhome as Godwin pulled up. While doing so, Anderson had a firearm holstered in a special pocket stitched into the back of his vest. Godwin already had his gun aimed out of the vehicle's window before it stopped two to three feet away from Anderson and Jones. Then Godwin began screaming at them while pointing the gun at Anderson. After Godwin ceased yelling, Anderson asked what was going on, and, at that moment, Godwin shot him. Jones stated the whole interaction lasted no longer than a minute and a half and during that time, Anderson's hands were empty. Although, at other times, she testified he had a license plate or a screwdriver in his hands.

Lynch also testified that Godwin had his gun pointed at Anderson as they pulled up and he did not see Anderson with a gun. He stated that Godwin said something to the effect of "Don't do it" to Anderson during the interaction. Ruiz also claimed at trial that he did not see a gun nor see Anderson reach for a gun. He added that after the shooting Godwin had dragged Anderson to the car and wanted to "get rid of him." Two other witnesses testified that while

Godwin was in jail, he had initially claimed the killing was in self-defense, but, when pressed, admitted that he had killed Anderson after Anderson claimed he didn't know anything about the guns. The State introduced numerous pieces of evidence from the scene of the crime and played an audio recording of Godwin's interview with Detective Hewson.

The defense impeached Lynch and Ruiz with prior interviews they had given to police in which Lynch stated that Anderson had brandished a gun and Ruiz said that Godwin stated to Anderson right after the shooting, "you pulled a gun on me. . . . I told you not to move." Godwin testified in his defense to the following sequence of events: Upon his arrival at Anderson's motorhome, Anderson and Jones were standing next to the Geo car and "started . . . after" Godwin's vehicle by "walking real fast towards" them. Anderson then pulled a gun out of his waistband. Upon seeing this, Godwin grabbed his pistol, took it out of its holster, and yelled at Anderson "don't, don't" and "[d]rop the gun, don't, don't pull the gun." Godwin said he shot Anderson only after Anderson aimed the gun at him and cocked the hammer. After the shot was fired, Godwin testified that he thought Anderson was still alive so he tried to get Anderson into his car to get him medical attention, but was unable to do so. Godwin further claimed that he did not realize they had taken Anderson's gun until they had returned to Godwin's trailer and he noticed that Ruiz was wiping the gun down with a t-shirt. Godwin took the gun from Ruiz, wrapped in the t-shirt, and placed it under his bed.

After a little over two and a half hours, the jury returned a verdict of guilty to second degree murder. The district court sentenced Godwin to twenty-five years indeterminate with fifteen years determinate.

## II.    ISSUES ON APPEAL

1. Did the district court abuse its discretion in denying Godwin's motion to suppress by finding that Godwin was not in custody for *Miranda* purposes during his interview?

2. Should this Court overrule *State v. Custodio* and hold that specific instances of conduct are admissible to show a victim's character for aggression or violence in self-defense cases?

3. Did the district court err by misstating the law while orally articulating its ruling that it would grant the State's motion in limine even though it later issued a written order that did not contain the misstatement?

4. Has Godwin carried his burden to show fundamental error based on the jury instructions he requested?

5. Has Godwin carried his burden to show fundamental error based on the prosecutor's statements during closing?

8

6. Do the errors in this case, when aggregated, show the lack of a fair trial pursuant to the cumulative error doctrine?

## III. STANDARD OF REVIEW

Because the discrete issues in this case each implicate their own standard of review, the standard will be set out under each issue's respective subheading.

## IV. ANALYSIS

**1. The district court did not err when it denied Godwin's motion to suppress because the totality of the circumstances shows that Godwin was not in custody during his interview.**

Godwin's arguments regarding the district court's denial of his motion to suppress address two distinct time periods during his interview. First, Godwin contends that his initial confession transformed the voluntary questioning into a custodial interrogation, thereby requiring suppression of all statements between the initial confession and the subsequent *Miranda* warnings. Second, Godwin argues that all statements made subsequent to the delayed *Miranda* warnings should be suppressed because the officer used a deliberate two-step interrogation process which failed to properly apprise Godwin that a separate round of interrogation had begun. In support of his argument, Godwin urges this Court to adopt an approach to the *Miranda*-custody analysis whereby a defendant is automatically considered to be in *Miranda* custody the moment a confession to a serious crime is uttered. The State responds by contending these arguments were not raised below. The State also argues that, given the totality of the circumstances, the district court properly concluded that Godwin was never in custody and, even if this Court does find that Godwin was in custody, the district court's error was harmless.

Concluding that Godwin adequately raised this issue below, we nevertheless hold that Godwin was not in custody during his interview with Detective Hewson. Therefore, we need not address Godwin's subsequent *Miranda*-based arguments.

### a. Standard of Review

In reviewing a district court order granting or denying a motion to suppress evidence, the standard of review is bifurcated. This Court will accept the trial court's findings of fact unless they are clearly erroneous. However, this Court may freely review the trial court's application of constitutional principles in light of the facts found.

*State v. James*, 148 Idaho 574, 576, 225 P.3d 1169, 1171 (2010) (citations omitted).

### b. Analysis

#### i. Godwin adequately preserved this issue on appeal.

First, the State contends that Godwin's theory on appeal was not adequately preserved below. Specifically, the State relies on *State v. Garcia-Rodriguez* to argue that Godwin presents a theory distinct from the theory he presented below. 162 Idaho 271, 396 P.3d 700 (2017). The State argues it is "manifestly unfair" to ask an appellate court to decide a question which was never presented to the trial court. Godwin concedes that the issues raised in his motion to suppress concerned (1) the voluntariness of his confession and (2) whether he invoked his right to counsel and refused to waive his *Miranda* rights. But Godwin points out that his transformation-upon-confession theory was touched upon in his memorandum in support of his motion to suppress and expanded upon at the suppression-motion hearing. Godwin contends that his theory on custody is "part and parcel of the custodial interrogation issue," because the trial court never reached his adequacy-of-warnings argument after it determined Godwin was not in custody. As a result, Godwin argues he is "obligated to address this issue on appeal."

This Court "ha[s] long held that appellate court review is limited to the evidence, theories and arguments that were presented below." *Garcia-Rodriguez*, 162 Idaho at 275, 396 P.3d at 704 (quoting *Nelson v. Nelson*, 144 Idaho 710, 714, 170 P.3d 375, 379 (2007)) (internal quotation marks omitted). "Generally, an issue presented on appeal must have been properly framed and preserved in the court below." *Fed. Home Loan Mortg. Corp. v. Butcher*, 157 Idaho 577, 581, 338 P.3d 556, 560 (2014) (citation and quotation marks omitted).

In *Garcia-Rodriguez*, this Court affirmed a district court's grant of a defendant's motion to suppress evidence stemming from a traffic stop in which the arresting officers found a large amount of cash and a drug dog alerted to the presence of drugs. 162 Idaho at 276, 396 P.3d at 705. Below, the State "consistently argued that [the defendant] was arrested pursuant to Idaho Code section 49-301(1) for driving without a license" and the arresting officer "reasonably concluded" the defendant likely would not appear for court which justified his arrest under Idaho Code sections 49-301 and 49-1407. *Id.* at 275, 396 P.3d 704. On appeal, the State presented a new argument altogether: the officer "developed probable cause to believe that [the defendant] had no driver's license, a violation of I.C. § 49-301(1)" which "alone constitutionally justified [his] arrest." *Id.* at 274–75, 396 P.3d at 703–04. Agreeing with the defendant's argument that this

theory was raised for the first time on appeal, this Court rejected the State's appellate argument because it was "nowhere to be found" in the record below. *Id.* at 275, 396 P.3d at 704.

In this case, Godwin's arguments below contain references to how "something changed" in the interview after his inculpatory statements. Godwin's brief in support of his motion to suppress made statements that underlie the premise of his appellate argument (E.g., "At least at that time, Corporal Hewson had made a decision that Jason Godwin was not going to be leaving the station, having made a confession"; "However, having already made statements while in custody, the defendant was trapped."). Similarly, Godwin's memorandum cited language and authority—namely *State v. Hamlin*, 156 Idaho 307, 313, 324 P.3d 1006, 1012 (Ct. App. 2014)—addressing what constitutes "custody" in the context of a custodial interrogation under *Miranda*.

At the suppression hearing, the court asked Godwin's counsel for clarification on the custody argument, stating: "Does the fact that he is, for argument sake, the suspect, they think they found their person, how is that relevant? Does it change the situation in terms of determining custodial interrogation?" Godwin's counsel responded by stating that it "weighs on what people were thinking . . . and what their intentions were, and whether they really—anyone believed that Jason Godwin was going to be free to leave when he walked into that room." The court responded by asking whether such factors are relevant when the *Miranda* custody determination also asks whether there were restrictions on freedom of movement.

In response, Godwin's counsel referenced *Hamlin* and talked about how "something changed" during the interview regarding whether Godwin was in custody:

> I believe it was possibly *Hamblin* [sic] but—whether a reasonable person in the suspect's position would have understood his or her situation. . . . even Detective Hewson talked about the fact that there was—something changed, something in the interview. So, at least at that point in time there was a recognition that something is going on here. . . . I think with a video it would have been maybe— we could have even seen body language and seen a change in the atmosphere at the police station that would have given us indication of something else is going on here, something—something that's changing this from whatever you want to call it, a conversation or an interview, into an interrogation. And an interrogation, by that I mean a custodial interrogation.

This question and answer centers on the tension between two considerations in the *Miranda*-custody determination: (1) what a reasonable person in the suspect's position would have understood his position to be, and (2) restrictions on freedom of movement. As Godwin argues here, some courts rely heavily on the "reasonable person in the suspect's position" prong

11

of the inquiry when determining whether custody attaches at the moment of confession. In its written ruling, the district court denied Godwin's motion on two principal grounds: (1) Godwin's statements were voluntary, and (2) Godwin did not invoke his right to counsel. Importantly, the district court also held: (3) even if Godwin did invoke his right to counsel, the invocation was ineffective because he did not carry his burden to show that he was in custody.

As a result, instead of being "nowhere to be found" in the record below, the bedrock of Godwin's appellate argument is present in the record and the district court made a determination on the issue of custody. Accordingly, Godwin properly presents this issue on appeal.

### ii. Godwin's admission to shooting Anderson in self-defense did not transform his voluntary interview into a custodial interrogation.

Godwin argues that he presents a matter of first impression for this Court: whether a suspect's confession to a serious crime transforms an otherwise voluntary interview with police into a custodial interrogation under *Miranda*.

The Supreme Court of the United States recently summarized the custody determination under *Miranda*:

> As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.
>
> Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. "Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody."

*Howes v. Fields*, 565 U.S. 499, 508–09 (2012) (citations omitted).

The defendant bears the burden of establishing custody. *James*, 148 Idaho at 577, 225 P.3d at 1172. In recently applying the *Miranda*-custody analysis, this Court has also identified

12

the following factors to aid the custody determination: "where the questioning occurred, the duration of the interrogation, whether the defendant is informed that the detention may not be temporary, and the intensiveness of the questions and requests of the police officer." *State v. Andersen*, 164 Idaho 309, 313, 429 P.3d 850, 854 (2018) (citing *James*, 148 Idaho at 578, 225 P.3d at 1173).

On this issue, Godwin argues in the alternative. First, Godwin urges this Court to adopt what he characterizes as a "bright-line rule" whereby a suspect is considered to be in *Miranda* custody the moment the suspect confesses to a serious crime. However, if this Court declines to adopt the bright-line approach, then Godwin advocates for this Court to declare that such an admission is a significant factor in the *Miranda*-custody analysis. Godwin asserts that the district court erred because, under either approach, a reasonable person in his position, "having admitted to a police officer at the police station to shooting and killing a person," would understand that he was "subject to a restraint on his liberty akin to formal arrest." We disagree and decline to adopt either standard.

First, Godwin did not confess to a serious crime. In his own words, he admitted to "self-defense." As such, the case law supporting his argument is ill-fitted to his situation. Furthermore, this Court has already articulated that "a court must examine all of the circumstances surrounding the interrogation" to determine whether *Miranda* custody attaches. *Andersen*, 164 Idaho at 313, 429 P.3d at 854 (citing *James*, 148 Idaho at 577, 225 P.3d at 1172). Whether a suspect confesses to a crime is already considered when determining if a suspect is in *Miranda* custody. Placing undue weight on this factor would not only create anomalous results (and questions as to what constitutes a "serious crime"), but would also be inconsistent with this Court's precedent: "When evaluating the totality of the circumstances, no single fact is controlling." *Id.* at 314, 429 P.3d at 855.

Godwin is correct that a number of state courts have held that a suspect is in custody upon confession to a serious crime under the rationale that a reasonable person would not perceive himself free to terminate the interrogation after such an admission. Notably, however, none of these cases dealt with a suspect asserting a legal defense to the crime in their admission.[2]

---

[2] *See, e.g.*, *State v. Pitts*, 936 So.2d 1111, 1134 (Fla. Ct. App. 2006) (holding that defendant's confession to holding a gun on a then missing person meant "a reasonable person in [defendant's] situation would have understood that he would not be allowed to go free."); *People v. Ripic*, 182 A.D.2d 226, 231 (N.Y. 1992) (finding custody after defendant's statement the she felt like she "had to kill him" because the victim, her husband, was abusive and she

Godwin also presents a line of cases which he contends hold that admission to a crime is a "substantial factor" in the custody analysis.[3]

The most recent case to deal with this issue is *State v. Bartelt*, in which the Wisconsin Supreme Court held that a defendant was not in custody when he confessed during an interview with police officers and, therefore, his request for counsel did not trigger *Miranda* protections. *Bartelt*, 906 N.W.2d 684, 699–700. In *Bartelt*, police suspected defendant of (1) murdering an acquaintance and (2) attacking a different person with a knife in a park. *Id.* at 687–88. After voluntarily coming to the police station for an interview, the defendant admitted to attacking the woman in the park and requested counsel. *Id.* at 688. He was arrested shortly thereafter. *Id.* The following day, police interviewed the defendant about the murder. *Id.* at 690. The defendant admitted only to going to a park, but then requested counsel and terminated the interview. *Id.* Police later discovered incriminating evidence in the park. *Id.* The district court denied defendant's subsequent motion to suppress his statements and any evidence stemming from them. *Id.* at 690–91. A jury convicted the defendant of murder. *Id.* at 691.

On appeal, the defendant argued that he was in custody when he requested counsel after confessing to the attack in the park, so he should not have been interrogated the following day about the murder. *Id.* The Wisconsin Supreme Court disagreed, holding, "although an admission

felt she could not divorce him); *People v. Carrol*, 742 N.E.2d 1247, 1249 (Ill. Ct. App. 2001) (affirming as not "manifestly erroneous," a trial court's finding that defendant's statement that he "struck his brother, started the car and closed the garage door" would cause a reasonable person to believe they were in custody.); *Jackson v. State*, 528 S.E.2d 232, 234–35 (Ga. 2000) (holding that the defendant's statement "I did it with a dude named Jack," was sufficient to cause defendant to "perceive himself to be in custody, and expect that his future freedom of action would be significantly curtailed" when "it" referred to the murder-robbery of a pregnant attendant at a dry-cleaning store.); *Commonwealth v. Smith*, 686 N.E.2d 983, 987 (Mass. 1997) (holding that defendant was in custody when, after voluntarily coming to the police station, he "told the police that he was there to confess to the murder of his girlfriend" because "if he had wanted to leave at that point, he would not have been free to do so."); *Kolb v. State*, 930 P.2d 1238, 1244 (Wy. 1996) (holding that after defendant "suddenly confessed to killing [the victim]" he was in custody for *Miranda* purposes despite providing apocryphal versions of the murder-kidnapping before that point because "[a] reasonable person who confessed to a killing while being interviewed at a police station would not feel free to terminate the interview and leave the station.").

[3] *See State v. Oney*, 989 A.2d 995, 1000 (2009) (holding that defendant's admissions to starting fires did not create a custodial situation because "mere confession to what defendant believed to be three misdemeanors would not necessarily lead a reasonable person in defendant's circumstances to believe that he was not free to leave."); *Barlelt*, 906 N.W.2d at 698, 699–700 (holding a defendant's "admission to attacking [victim] was not enough to transform his status to that of 'in custody' given the totality of the circumstances" because the confession "was not immediately associated with a restraint on freedom of movement to the degree associated with formal arrest."); *Xu v. State*, 100 S.W.3d 408, 415 (2002) (holding defendant "was in custody from the moment he made his 'pivotal admission,' [that he grabbed his wife by the throat when police knew the cause of death was strangulation] even though he was not formally arrested until some time later" because the police failed to arrest him at that moment only because they "believed they would have had a problem with custodial interrogation.").

of guilt to a serious crime is a factor to consider in a custody analysis, [the defendant's] admission to attacking M.R. was not enough to transform his status to that of 'in custody' given the totality of the circumstances." *Id.* at 699–700. Though the defendant was questioned at a police station and the detective increasingly treated the defendant as the target of a serious felony investigation, the *Bartelt* court found that he was not in custody because he came to the police station voluntarily, was questioned in an interview room with the door open, and the detective informed him that he was not under arrest and could leave at any time. *Id.* at 684, 695–96.

We follow a similar tack to the *Bartelt* court. Confession to a serious crime can be considered as a factor in the totality-of-the-circumstances inquiry. Nevertheless, after an examination of the totality of the circumstances found by the district court, we determine that Godwin has failed to carry his burden to establish that he was in custody for purposes of *Miranda*.

First, while the questioning occurred at the Kooskia Sheriff's Office, *Miranda* warnings are not required "simply because the questioning takes place in the station house." *Andersen*, 164 Idaho at 313, 429 P.3d at 854 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). Rather, "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him in custody" because it was "that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Id.* Here, the hallmarks of a coercive environment are absent. Godwin concedes that he was not in custody when he sat down with Officer Hewson to answer questions. As the district court found, Godwin arrived at the police station voluntarily. The district court noted that Godwin was interviewed in a working part of the sheriff's office rather than an interrogation room. The Kooskia Sheriff Office occupies the floor above the City Hall building, with a large main room. The back wall of the main room features windows and a door leading to a conference room which contains two large tables pushed together. After following Officer Hewson into the conference room, Godwin took the seat closest to the door, which was closed, but unlocked. The conversation was recorded with a digital audio recorder which was visible to Godwin during the duration of the interview. The interview lasted around fifty minutes, during which Godwin exited the station to have a cigarette break (albeit accompanied by an officer). This is not the "sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Andersen*, 164 Idaho at 313, 429 P.3d at 854.

15

Second, the "intensiveness" of police questioning does not weigh in favor of custody. As noted by the district court, although other officers interacted with Godwin while he was at the station, Officer Hewson was the only police officer in the room with Godwin while he was being questioned. At no time during the interview was Godwin patted down, handcuffed, or otherwise physically restrained. Moreover, the district court found that Officer Hewson was "not threatening or intimidating." While Officer Hewson did have his badge and gun attached to his belt, he was not dressed in an official uniform, but was wearing a long-sleeved t-shirt with "Idaho County Sheriff" printed on it and BDU ("Battle Dress Uniform") pants.

Third, the factor of whether the defendant was informed that the interaction might be temporary also weighs against a finding of custody. Godwin contends that the detailed questioning after his initial admission of "homicide" shows that the interview transformed into a custodial interrogation. Godwin argues that Hewson used "implicitly coercive" tactics by using minimization techniques, insinuating that things would be better if Godwin told the truth, and analogizing the situation to the old horror movie *The Hills Have Eyes* to imply that one never knows when they're being watched. Lastly, Godwin asserts that Hewson told Godwin he was not free to leave until he was satisfied with his answers. To support this, Godwin points to statements made by Hewson.

The tactics used by the officer during an interrogation may be considered when determining whether the interview was coercive, but are only part of the totality-of-the-circumstance inquiry for custody. Furthermore, "[d]eceptive police practices do not necessarily create coercion which would render a suspect's subsequent confession involuntary and excludable" so it follows that such practices are not enough to automatically convert a voluntary interview into a custodial interrogation. *State v. Smith*, 162 Idaho 878, 883, 406 P.3d 890, 895 (Ct. App. 2017) (citation omitted). Here, the district court found that there was no coercive police conduct below. Godwin's admission did not substantially change the tenor of the interview from the time of his admission to the moment he was given his *Miranda* warnings. While Officer Hewson did not expressly tell Godwin that he was not under arrest or free to leave, the district court correctly noted that he did not tell Godwin that he had to stay and answer questions. When Hewson said that he "probably" wouldn't arrest Godwin but somebody "might," the implication is Godwin may be arrested in the future, but was not currently under arrest. While such a statement is not conclusive, it would not lead a reasonable person in

16

Godwin's position to understand his position to be that of "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *James*, 148 Idaho at 576–77, 225 P.3d at 1171–72 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted).

Lastly, Godwin's subsequent arrest does not automatically mean that Godwin was "in custody" during the interview. *See Stansbury v. California*, 511 U.S. 318, 325 (1994) ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."); *see also Bartelt*, 906 N.W.2d at 698 ("[T]hat [defendant] was arrested at the end of his interview does not necessarily mean that he was in custody at any point prior to his arrest."). After Godwin's confession, Hewson discussed Godwin's claims with Lieutenant Johnson and a prosecutor. The decision to arrest Godwin was made only after the discussion revealed that, at that time, there was no corroborating evidence of another gun at the scene.

In sum, the totality of the circumstances shows that Godwin was not in custody during the interview with Detective Hewson. Therefore, the district court did not err in denying Godwin's motion to suppress by concluding that *Miranda* protections did not apply to his questioning. As a result, Godwin's remaining claims regarding *Miranda* violations are inapplicable.

### 2. We decline Godwin's invitation to overrule *State v. Custodio* and instead confirm that specific instances of a victim's conduct are inadmissible under Rule 405 of the Idaho Rules of Evidence.

In a motion in limine filed a few weeks before trial, the State asked the court to prohibit the expected testimony of two proposed defense witnesses "about specific instances of conduct showing that [Anderson] was violent and aggressive." Both witnesses were expected to testify that Anderson had pointed a gun at them on prior occasions. The court granted the motion, issuing an order prohibiting "any statements or references to specific incidents in which Kyle Anderson pointed a gun at any witness" under Rule 405 of the Idaho Rules of Evidence. The court followed the Court of Appeals' decision in *State v. Custodio* which concluded that a victim's character for violence or aggression is not an essential element of a self-defense claim as required for the admission of specific-act evidence under Rule 405. 136 Idaho 197, 30 P.3d 975 (Ct. App. 2001).

17

Godwin asks this Court to overrule *Custodio* as incorrectly decided and patently unfair to criminal defendants. Godwin argues that it is unjust to hold a victim's propensity for violence inadmissible under Rule 405(b) on the rationale that it is not an essential element of the defense. Specifically, Godwin argues that the "rigid rule articulated in *Custodio* renders Rule 405(b) a nullity, as it applies to defenses" because "a victim's specific act evidence can never be admissible for a self-defense claim." The State responds by arguing that Godwin has failed to show any basis for disavowing *Custodio* and points out that the plain language of Rule 405 requires the relevant character trait to be "an essential element of the charge, claim, or defense" in order to use specific acts to prove character. I.R.E. 405(b). The State also argues that Godwin's position is a minority rule and Idaho's case law supports following the majority rule.

### a. Standard of Review

"The trial court's judgment concerning admission of evidence shall 'only be disturbed on appeal when there has been a clear abuse of discretion.'" *State v. Hill*, 161 Idaho 444, 447, 387 P.3d 112, 115 (2016) (quoting *State v. Perry*, 150 Idaho 209, 218, 245 P.3d 961, 970 (2010)). Accordingly, such decisions are subject to the four-part abuse of discretion analysis:

> Whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.

*Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). However, the trial court's "interpretation of a rule of evidence, like the interpretation of a statute, is reviewed de novo." *Hill*, 161 Idaho at 447, 387 P.3d at 115 (citing *State v. Moore*, 131 Idaho 814, 821, 965 P.2d 174, 181 (1998)).

Here, Godwin challenges the interpretation of Rule 405 articulated by the Court of Appeals in *Custodio* and adopted by the district court, rather than arguing that specific evidence was wrongly excluded under the rule. Accordingly, this Court will review that interpretation de novo.

### b. Analysis

Whether specific-act evidence may be used to show that a person acted in conformity with a character trait in self-defense claims is covered by two evidentiary rules: Rule 404 and 405 of the Idaho Rules of Evidence ("Rule 404" and "Rule 405"). Both rules have recently been amended, but we address the rules as they applied at the time of Godwin's trial.

18

Rule 404 governs the admissibility of character evidence. Subsection 404(a) states the general prohibition against character evidence while subsection 404(a)(2) articulates an exception to the general rule:

> (a) **Character evidence generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:
> . . . .
> (2) **Character of Victim.** Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor; . . .

I.R.E 404 (1985) (amended 2018).

While Rule 404 concerns the admissibility of character evidence, Rule 405 specifies the allowable methods of proving character:

> (a) **Reputation or opinion.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
>
> (b) **Specific instances of conduct.** In cases in which evidence of character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of the person's conduct.

I.R.E. 405 (1985) (amended 2018). Rule 405 requires specific-act evidence to be an essential element of the crime because it is the most convincing type of evidence and therefore "possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time." F.R.E. 405 (2011) advisory committee's note (citing McCormick § 153). Therefore, "[w]hen character is used circumstantially and hence occupies a lesser status in the case, proof may be only by reputation and opinion." *Id.*

When applying both rules to self-defense cases, Rule 404(a) permits a defendant to present evidence of a victim's propensity for violence for certain purposes. I.R.E 404; *Marr v. State*, 163 Idaho 33, 37, 408 P.3d 31, 35 (2017); *State v. Hernandez*, 133 Idaho 576, 584, 990 P.2d 742, 750 (Ct. App. 1999). However, Rule 405 limits the form of such evidence to opinion and reputation testimony because the victim's propensity for violence is not an essential element of the claim. *Custodio*, 136 Idaho at 204, 30 P.3d at 982. For self-defense claims, Rule 405's

prohibition of specific act evidence is consistent with the long-standing law in Idaho before the adoption of the Idaho Rules of Evidence. *State v. Dallas*, 109 Idaho 670, 679, 710 P.2d 580, 589 (1985) (noting that while the victim's reputation for being quarrelsome is admissible for certain purposes, it "may not be extended to include specific acts.") (quoting *State v. Wilson*, 41 Idaho 616, 243 P. 359 (1925)). This well-established law shares the same rationale as Rule 405:

> Idaho law did not permit the accused to introduce evidence of specific instances of the victim's prior conduct in order to support an inference that the victim was the first aggressor. The reason for this prohibition is that evidence of specific instances of the victim's conduct, while probative, tends to be highly prejudicial. The bad character of the deceased is likely to be thought of by the jury as an excuse for the killing. Learning of the victim's bad character could lead the jury to conclude that the victim merely "got what he deserved" and to acquit for that reason. Accordingly, the majority view is to disallow such evidence.

*Dallas*, 109 Idaho at 679, 710 P.2d at 589 (1985) (citations omitted).

This underlying rationale guided the Court of Appeals in *Custodio*. There, the defendant was kicked out of a house party after an altercation with party-goers only to return with a baseball bat and a gun. *Custodio*, 136 Idaho at 200, 30 P.3d at 978. In the ensuing fight, the defendant shot and killed two men while wounding a third individual. *Id.* After he was convicted, the defendant appealed and argued that the district court erred in excluding testimony of a defense witness relating to a victim's specific act of prior aggressive conduct. *Id.* at 203, 30 P.3d at 981. The district court held such testimony was admissible under Rule 404 in light of the defendant's self-defense claim, but nevertheless needed to be excluded because Rule 405 permitted only opinion or reputation evidence on the claim, rather than specific-act evidence. *Id.*

The Court of Appeals found no error because Rule 405's plain language requires that "in order for proof of [a] person's character to be admissible in the form of specific instances of conduct the character trait must be an essential element of a charge, claim, or defense." *Id.* at 204, 30 P.3d at 982. Holding that the victim's character trait for aggression or violence is not indispensable to a successful self-defense claim, the *Custodio* court agreed with the Ninth Circuit Court of Appeals' decision in *United States v. Keiser*:

> Proof of a victim's propensity for violence, standing alone, does not prove an element of a claim of self-defense. Proof of a victim's violent character does not show that the victim was the first aggressor in a particular conflict, nor does proof of a victim's passive demeanor foreclose the defendant from asserting a claim of self-defense.

*Id.* (discussing *Keiser*, 57 F.3d 847 (9th Cir. 1995)). As a result, while such evidence was relevant for the purpose of inferring that a victim acted in conformity with violent propensities, the victim's propensity for violence is not an essential element of a claim of self-defense. *Id.*

Despite the plain language of the rule, its rationale, and a firm basis in Idaho case law, Godwin advocates for this Court to allow specific instances of character evidence where there is dispute about who was the first aggressor. In support, Godwin points to the standard adopted by the Supreme Court of Massachusetts in *Commonwealth v. Adjutant*, 824 N.E.2d 1, 12 (2005). The *Adjutant* court disagreed that the concerns regarding specific-act evidence required a wholesale exclusion because "[t]estimony about the victim's prior acts of violence can be convincing and reliable evidence of the victim's propensity for violence." *Id.* (citations omitted). The *Adjutant* court adopted a rule where a trial judge has discretion to admit specific-act evidence of prior violent conduct to support a claim that the victim initiated the altercation when the identity of the first aggressor is in dispute. *Id.* The rule relied on providing limiting instructions to the jury to mitigate possible prejudice along with the trial judge's discretion "to exclude marginally relevant or grossly prejudicial evidence" to prevent "the undue exploration of collateral issues." *Id.* at 13.

We are not persuaded to follow the *Adjuntant* court's approach. First, Idaho has long-standing law on this issue. *See Dallas*, 109 Idaho at 679, 710 P.2d at 589 (1985). "[T]he rule of stare decisis dictates that we follow [controlling precedent], unless it is manifestly wrong, unless it has proven over time to be unjust or unwise, or unless overruling it is necessary to vindicate plain, obvious principles of law and remedy continued injustice." *State v. Dana*, 137 Idaho 6, 9, 43 P.3d 765, 768 (2002) (quoting *Reyes v. Kit Manufacturing Co.*, 131 Idaho 239, 953 P.2d 989 (1998)). Second, Massachusetts does not have codified rules of evidence like Idaho does, so the *Adjuntant* court was crafting a rule out of whole cloth. *See* MA Guide to Evidence § 102 ("Because Massachusetts has not adopted rules of evidence, the development of Massachusetts evidence law continues to be based on the common law and legislative processes."). If this Court were to adopt Massachusetts' approach, we would do so in the face of the plain language of Rule 405, which disallows specific act evidence unless it pertains to an "essential element" of the claim. Lastly, Idaho's approach to specific act evidence is the majority rule. *See Adjutant*, 443 Mass. at 675, 824 N.E.2d at 20 (Cowin, J., dissenting) (pointing out that the "majority of jurisdictions cited by the court that have considered the issue of victim character evidence do not

21

permit the use of specific act evidence unknown to the defendant to prove who was the first aggressor, but instead permit only reputation or opinion evidence to show a victim's violent character."). Thus, Godwin has failed to show that the prohibition on specific-act evidence should be altered. Accordingly, we decline Godwin's invitation to create an exception to Rule 405's prohibition on specific-act evidence in self-defense cases by overruling *Custodio* and other prior precedent.

3. **The district court's overbroad statement regarding the foundational requirement for the presentation of opinion or reputation evidence of a victim in a self-defense case does not constitute error because the misstatement was corrected by the court's written ruling.**

Godwin asserts that the district court erred by imposing an overbroad foundational requirement of proving Godwin was aware of Anderson's propensity for violence before producing reputation or opinion testimony regarding Anderson's character. For this issue, Godwin directs this Court to a solitary oral statement made by the district court in the late afternoon of the second day of trial. After jury selection and voir dire, the court heard argument on motions in limine filed by both the State and the defense out of the presence of the jury. While telling the parties how it would rule on the State's motion in limine related to specific-act evidence, the court stated:

> The general rule is that evidence of character is not admissible to prove conduct at a specific incident, meaning propensity. There's an exception to the general rule that alleged that the defendant that was acting in self-defense in certain instances to bring forth propensity but only can be made as to reputation and opinion testimony is my reading of Custodio. And if you read the trial court in Custodio, the trial court said that he had previously allowed opinion testimony with reference to propensity for violence and reputation for the same. So, this order does not bar that type of evidence from being introduced, *if there's a proper foundation that the defendant in this case had knowledge of the same or it was communicated to them* [sic]; however, specific evidence of instances of conduct can only be introduced as direct evidence if it falls under Rule 404(b). . . . Evidence purporting to show Kyle Anderson's propensity to violence shall be presented only in the form of reputation or opinion evidence. . . . Again, there will be a necessary requirement of foundation to allow for the introduction of opinion testimony as to reputation or opinion.

(Italics added). After the court's comments, trial proceeded to opening statements. The following morning, the court filed a written order granting the State's motion in limine. The written order does not contain the complained-of language.

22

### a. Standard of Review

Like the previous issue, Godwin challenges an interpretation of Rule 404, rather than a determination of whether specific evidence is inadmissible under the rule. Accordingly, we evaluate the district court's interpretation under a de novo standard of review. *Hill*, 161 Idaho at 447, 387 P.3d at 115.

### b. Analysis

Godwin's argument hangs on a single statement in a long soliloquy that otherwise focused on a separate evidentiary issue. Godwin zeros in on the district court's oral statement because the court's written order appears to have remedied any possible confusion that the statement could have created. Though the oral statement and written order were made known almost two full days in advance of the defense's presentation of evidence, nothing in the record—no question, clarification, nor proffer of evidence—suggests that the court's oral statement misled the parties or affected the presentation of evidence. On this record, the district court's error, if any, when it made an overbroad statement of law, was negligible because the court's written ruling supplanted and corrected the statement.

Godwin is correct that the court's initial statement articulated only part of the applicable law. As already mentioned, "a defendant can offer reputation or opinion evidence about the victim's character trait for violence to show the victim was the initial aggressor or that the force used against the victim was necessary for self-protection." *Marr*, 163 Idaho at 37, 408 P.3d at 35 (citing I.R.E 405(a) and *Hernandez*, 133 Idaho at 584, 990 P.2d at 750). However, different foundational requirements apply depending on what purpose the evidence is used for. *See Hernandez* at 579–80, 990 P.2d at 745–46. If the victim's character trait for violence is being used to support specific elements of self-defense or defense of others (such as whether the defendant reasonably feared the victim and reasonably believed that the force used was necessary to repel the victim's attack), then the defendant must first show an awareness of that reputation. *See id.* (quoting *Keiser*, 57 P.3d at 854); *see also Dallas*, 109 Idaho at 679, 710 P.2d at 589. Without such foundation, the information is irrelevant to the defendant's state of mind during the altercation.

However, if a defendant wishes to show that the victim was the initial aggressor, then there is no need to show that he was aware of the victim's reputation for violence in order to

present character evidence under Rule 404(a)(2). *Hernandez*, 133 Idaho at 584, 990 P.2d at 750 (quoting *Keiser*, 57 P.3d at 854). As aptly recognized by the Court of Appeals:

> The fact that section 404(a)(2) is an exception to the rule against introducing character evidence to imply that a person acted in conformity with that character on a particular occasion suggests that the very purpose of victim character evidence is to suggest to the jury that the victim did indeed act in conformity with his violent character at the time of the alleged crime against him. The purpose is not to provide insight into the reasonableness of the thought processes of the defendant. Thus, whether the defendant knew of the victim's character at the time of the crime has no bearing on whether victim character evidence should come in under section 404(a)(2).

*Hernandez*, 133 Idaho at 584, 990 P.2d at 750 (quoting *Keiser*, 57 P.3d at 854) (citations omitted). Given this consideration, the district court's oral statement did not specifically account for all the possible uses of character evidence.

Despite this, the district court corrected any possible error arising from its oral statement in its written order. The proscriptive portion of the court's written order states the rule regarding reputation or opinion evidence without the foundational requirement of awareness:

> Therefore, any statements or references to specific incidents in which Kyle Anderson pointed a gun at any witness shall be prohibited during voir dire, opening statements, the trial, and closing arguments. Evidence purporting to show Kyle Anderson's propensity to violence shall be presented only in the form of reputation or opinion evidence. In the event that such reputation or opinion evidence is introduced, inquiry into relevant specific incidents of conduct will be allowed on cross-examination. I.R.E. 405(a).

Nothing in the record suggests that the Court's oral statement survived the written order. Tellingly, if the court's oral statement actually excluded evidence in this case, then Rule 103(a) of the Idaho Rules of Evidence would have required counsel to bring the purportedly excluded evidence to the attention of the court in order to preserve the error:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

But Godwin fails to point to any instance where the district court refused to admit reputation or opinion evidence of Anderson's violent or aggressive character for lack of proper foundation. The defense made no mention of possible reputation or opinion evidence, let alone which purpose such evidence would be used to show. We have previously held that a trial court's misstatement of the law on an evidentiary issue does not relieve the complaining party of his

24

obligation to make an offer of proof. *See Read v. Harvey*, 147 Idaho 364, 368, 209 P.3d 661, 665 (2009) (holding that "[t]he district court's initial confusion regarding the law of the case doctrine is not a basis for reversal" when the trial court made a legally erroneous statement at the outset of trial but the complaining party failed to make an offer of proof); *State v. Schoonover*, 125 Idaho 953, 954, 877 P.2d 924, 925 (Ct. App. 1994) (noting that Rule 103(a)(2) reflects "the long-standing policy that in order to preserve an evidentiary ruling for appellate review, the party assigning error to the ruling must make a sufficient record from which an appellate court can adequately determine whether there was error, and also whether the rights of such party have been prejudiced.").

Here, there is not an adequate record to determine whether there was error. Godwin never brought the "substance of the evidence" to the attention of the trial court. While Godwin definitively made an offer of proof for the specific-act evidence he wished to admit during his argument on the State's motion, he never made an offer of proof for the allegedly affected opinion or reputation evidence. In addition, the substance of the opinion or reputation evidence is not "apparent from the context" in this case. I.R.E. 103(a)(2) (1985) (amended 2018). The statement arose in the context of specific-act evidence. The State's motion sought to prohibit specific-act evidence. Godwin specifically opposed the State's motion in limine by asking the court to overrule *Custodio* and allow the specific-act evidence. Only the court's oral statement strayed outside the scope of specific-act evidence and was corrected the following morning by the court's written order.

If the court's oral statement was as pivotal as Godwin contends, then the record would bear some marks of its importance. But after an examination of the record, Godwin's argument rests only upon speculation; speculation about theoretical evidence that could have been used for a permissible purpose but was supposedly excluded by a solitary statement that conflicted with a later written recitation.[4] On these facts, no error can be assigned to the district court's oral statement.

---

[4] At oral argument, Godwin suggested that defense counsel relied on the Court's oral ruling and was unaware of the correction, since it was not mentioned again by the judge in open court. However, whenever the court makes a written ruling on an issue, it is reasonable for the court to assume the attorneys read it.

**4. The district court did not commit fundamental error by failing to instruct the jury on justifiable homicide under Idaho Code section 18-4009(1) because Godwin invited any error by requesting both instructions.**

Godwin argues that the district court committed fundamental error by failing to instruct the jury on justifiable homicide under section 18-4009(1) because that section does not require his response to be reasonable under section 18-4010. Godwin contends that he was resisting an "actual, ongoing attack" under section 18-4009(1) based on Godwin's testimony about his version of the events. The State responds by first asking this Court to reinstate the "rule that claims of instructional error not raised before the district court are waived for purposes of appeal." Alternatively, the State argues that Godwin invited the error and affirmatively waived any objections by declining to bring the issue before the court at the various jury instruction conferences. Lastly, the State contends that Godwin cannot show fundamental error because the evidence could only show that the killing of Anderson was done in response to an aggravated assault by threat which would fall under subsection 18-4009(3) of the Idaho Code.

a. **Standard of Review**

"Whether the trial court properly instructed the jury presents a question of law over which this Court exercises free review." *State v. Hall*, 161 Idaho 413, 423, 387 P.3d 81, 91 (2016) (citing *State v. Poe*, 139 Idaho 885, 905, 88 P.3d 704, 724 (2004)).

b. **Analysis**

During Godwin's trial, Idaho's justifiable-homicide statute read in relevant part:

Homicide is also justifiable when committed by any person in either of the following cases:

> 1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or,
>
> . . .
>
> 3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mortal combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed; or, . . .

I. C. § 18-4009 (1972) (amended 2018).

26

This section, at the time of Godwin's trial, was modified by section 18-4010 (which has since been repealed):

> A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of the preceding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.

I. C. § 18-4010 (1973) (repealed 2018).

Rule 30(b) of the Idaho Criminal Rules contains language stating that unobjected-to error based on jury instructions is not preserved for appeal. I.C.R. 30(b)(4) ("No party may assign as error the giving of or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the instruction to which the party objects and the grounds of the objection.") (amended 2017). The State urges this Court to "reinstate the rule that claims of instructional error not raised before the district court are waived for purposes of appeal." The State asserts this Court "retreated" from this rule in *State v. Smith* because the language prohibiting assignment of error had been removed from the rule. 117 Idaho 225, 228, 786 P.2d 1127, 1131 (1990). But, since the language has been reinserted since *Smith*, the State urges this Court to adopt it once again.

We need not "reinstate" the rule because we have already required an objection under this rule in *Hall*, 161 Idaho at 422, 387 P.3d at 90. In *Hall*, this Court held that submitting jury instructions along with a supporting memorandum, by itself, was not enough to preserve an error under Rule 30(b):

> Merely submitting a proposed instruction that included the defense of justifiable homicide as set forth in Idaho Code section 18-4009(1) and a memorandum explaining why the defense thought the instruction should be given was not sufficient under Rule 30(b) to preserve any instructional error on that issue. Rule 30(b) required that defense counsel object to the failure to give the instruction during the jury instruction conference and state distinctly the grounds of the objection.

*Id*. Therefore, Godwin failed to comply with Idaho Criminal Rule 30(b) and any alleged error is not properly preserved for appeal. Because "the alleged error was not followed by a contemporaneous objection . . . it shall only be reviewed by an appellate court under Idaho's fundamental error doctrine." *Id.* at 413, 422, 387 P.3d at 90. Godwin agrees that the alleged error should be addressed under the fundamental error standard.

Unlike *Hall*, where the district court refused to give the requested instruction, Godwin concedes that section 18-4009(1) appeared in Jury Instruction No. 20, which reads as follows:

INSTRUCTION NO. 20

The defendant contends as a defense in this case that the killing was justifiable because the defendant was acting in self-defense.

Under the law, homicide is justifiable if committed while resisting an attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person.

The burden is on the prosecution to prove beyond a reasonable doubt that the homicide was not justifiable. If there is a reasonable doubt whether the homicide was justifiable, you must find the defendant not guilty.

Godwin argues that by placing this instruction next to Jury Instruction No. 21, which spelled out the requirements for finding self-defense under subsection 18-4009(3), the instructions confused the jury. Godwin asserts that Jury Instruction No. 20's failure to explicitly state the caveat contained in section 18-4010 "failed to instruct the jury that subsection (1) was an entirely separate scenario of justifiable homicide, distinct from self-defense" and therefore "erroneously informed the jury that Subsection (1) was part of the legal definition of self-defense."

Even assuming this argument has merit, Godwin invited the error by requesting both instructions.[5] "It has long been the law in Idaho that one may not successfully complain of errors one has acquiesced in or invited. Errors consented to, acquiesced in, or invited are not reversible." *State v. Dunlap*, 155 Idaho 345, 379, 313 P.3d 1, 35 (2013) (citing *State v. Owsley*, 105 Idaho 836, 838, 673 P.2d 436, 438 (1983)) (internal citations omitted). A defendant "may not consciously invite district court actions, and then successfully claim these actions are erroneous on appeal. Nor may a criminal defendant successfully allege error in a ruling of the court, when the defendant himself requested the ruling." *Owsley*, 105 Idaho at 837, 673 P.2d at 437 (1983) (citations omitted).

Godwin requested Jury Instructions No. 20 and No. 21 by motion prior to trial. Before the jury-instruction conference, Godwin's requested instructions were incorporated by the Court in its proposed instructions and earmarked with a parenthetical indicating the party who requested the instruction. What would become Jury Instruction No. 20 was designated as a defense instruction. At a jury instruction conference before the defense presented his case, the following

---

[5] It is worth noting that Godwin has not argued that the instructions were offered in the alternative.

exchange occurred regarding Jury Instruction No. 20 (which was then referred to as Jury Instruction No. 21):

> THE COURT: . . . Instruction 21, self-defense. Just for the purpose of argument, Mr. MacGregor, let's assume that there is satisfactory evidence in this matter to assert the grounds of self-defense. My inquiry to you, when I come to you, will be based upon -- you may have objection whether or not this be offered at this point in time, but to the extent that there would be an instruction to self-defense, do you have, Mr. Monson, any objection to 21 *which is your requested instruction?*
>
> MR. MONSON: No, Your Honor.
>
> THE COURT: Mr. MacGregor?
>
> MR. MACGREGOR: No, Your Honor. Based on how the Court just recited that situation, we would have no objection.
>
> THE COURT: Instruction No. 22, the same terms will apply if the Court was still going to give the same, do you have any objection to the instruction, Mr. Monson? *It's your requested instruction.*
>
> MR. MONSON: No, Your Honor.
>
> THE COURT: Mr. MacGregor?
>
> MR. MACGREGOR: No, Your Honor.

This dialogue confirms that Godwin requested the jury instructions and demonstrates both the opportunity and failure to object. Accordingly, Godwin invited any possible error arising from reading the two jury instructions side by side.

### 5. The State committed prosecutorial misconduct during closing argument by impermissibly vouching for witnesses and evidence but the misconduct does not rise to the level of fundamental error.

Godwin asserts that the State committed prosecutorial misconduct by impermissibly vouching for the credibility of witnesses by telling the jury that he personally believed in the State's case and that the State's witnesses were credible. This alleged misconduct, Godwin asserts, amounted to fundamental error by violating Godwin's right to due process and his right to a jury trial under both the Idaho and U.S. Constitutions. The State responds by stating that Godwin is unable to meet the standard of fundamental error. First, the State argues that Godwin cannot show error because the prosecutor's statements do not constitute misconduct because nothing in the prosecution's closing arguments hinted that there was evidence known to the prosecutor which was not known by the jury. Furthermore, the State contends, the prosecution made clear that credibility determinations were to be made by the jury.

### a. Standard of Review

At trial, Godwin did not object to any of the prosecutor's comments that form the basis of this claim of prosecutorial misconduct. As result, his claim is examined under a fundamental-error analysis. "Where prosecutorial misconduct was not objected to at trial, Idaho appellate courts may only order a reversal when the defendant demonstrates that the violation in question qualifies as fundamental error . . . ." *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010). "Fundamental error is error that: '(1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless.'" *State v. Lankford*, 162 Idaho 477, 494, 399 P.3d 804, 821 (2017) (citing *Perry*, 150 Idaho at 228, 245 P.3d at 980).

### b. Analysis

Generally, "[w]here a prosecutor attempts to secure a verdict on any factor other than the law as set forth in the jury instructions and the evidence admitted during trial, including reasonable inferences that may be drawn from that evidence, this impacts a defendant's Fourteenth Amendment right to a fair trial." *Perry*, 150 Idaho at 227, 245 P.3d at 979. It is the prosecutor's duty to "see that a defendant has a fair trial, and that nothing but competent evidence is submitted to the jury," so prosecutors "should not exert their skill and ingenuity to see how far they can trespass upon the verge of error, because generally in so doing they transgress upon the rights of the accused." *Lankford*, 162 Idaho at 494, 399 P.3d at 821 (quoting *State v. Christiansen*, 144 Idaho 463, 469, 163 P.3d 1175, 1181 (2007)). Yet, "in reviewing allegations of prosecutorial misconduct the Court must keep in mind the realities of trial." *Id.* (quoting *State v. Ellington*, 151 Idaho 53, 62, 253 P.3d 727, 736 (2011)). "A fair trial is not necessarily a perfect trial." *Id.*

In closing arguments, both parties are generally "given wide latitude in making their arguments to the jury and discussing the evidence and inferences to be made therefrom." *State v. Severson*, 147 Idaho 694, 720, 215 P.3d 414, 440 (2009). "Whether comments during closing arguments rise to the level of fundamental error is a question that must be analyzed in the context of the trial as a whole." *State v. Carson*, 151 Idaho 713, 718, 264 P.3d 54, 59 (2011) (citing *Severson*, 147 Idaho at 720, 215 P.3d at 440 (2009)). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a

denial of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). "Prosecutorial misconduct during closing arguments will constitute fundamental error only if the comments were so egregious or inflammatory that any consequent prejudice could not have been remedied by a ruling from the trial court informing the jury that the comments should be disregarded." *State v. Parker*, 157 Idaho 132, 146, 334 P.3d 806, 820 (2014).

The first inquiry is to determine whether the comments rise to the level of prosecutorial misconduct. At the outset, Godwin admits that "the prosecution noted several times that credibility determinations had to be made by the jury," but nevertheless contends that "the prosecution clearly intended to interject personal opinions in an attempt to improperly influence the jury's credibility determinations . . . ." Godwin asserts that five statements made by the prosecutor in his closing argument amounted to prosecutorial misconduct. The precise statements Godwin alleges amounted to prosecutorial misconduct are presented in italicized font and provided in context.

> Now, Amanda Jones is not the most sophisticated witness, but I would submit to you, I don't think she came off as a schemer, a planner. She was not sophisticated, but I would submit to you and you judge her testimony. [1] *I would submit to you that she was telling the truth,* and that's something you have to decide, not me. And what Mr. Monson and I tell you is not evidence, but the evidence proves that Mr. Godwin is guilty of second degree murder.

> Beau Lynch. . . . What motive does he have to lie? Judge his testimony. He was scared. He was scared to sit up there and tell the truth about his former boss, a friend. And [2] *I think he was scared, and I think he was nervous, but even with all that, even with all that he still told the truth.* And these credibility questions are what you have to answer.

> . . . And Amanda Jones, she's not a sophisticated witness, but [3] *I believe she was a credible witness.* Testimony from her was Mr. Godwin, after he shoots and kills Mr. Anderson, runs up to her. She's on her knees, and he's got the gun pointed at her head. Why would she make that up? What incentive does she have to say that? The shooting is over. Her boyfriend is dead. I mean, when you talk about credibility, what reason does she have to lie about that? I mean, it doesn't help – it doesn't help the shooting incident. It's something that happened to her and she's telling you, but what I'm saying is if someone – if you believe that, [4] *which I think was credible,* it is totally inconsistent with self-defense, and these are factors for you to consider.

> If you look at everything that was done after this incident, it is not consistent with a person who is claiming self-defense, not at all. And you can also consider what the State's evidence was when you consider whether this was self-defense. They all said Kyle Anderson is standing there without any gun in his hand, and Jason Godwin shoots him. And I would submit he has a reason to lie. We know he has

31

lied before. He is not credible. He admitted to many lies. And [5] *I would submit that the evidence that the witnesses that the State put on are credible*, and, again, ladies and gentlemen, the State would ask you to find Mr. Godwin guilty of second degree murder.

Vouching by the prosecution may rise to the level of prosecutorial misconduct because it can "plac[e] the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggest[] that information not presented to the jury supports the witness's testimony." *Lankford*, 162 Idaho at 497, 399 P.3d at 824 (quoting *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)). Importantly, however, "prosecutors may argue reasonable inferences based on the evidence, including that one of the two sides is lying. Furthermore, prosecutors are permitted to respond to defense counsel's attempts to impeach the credibility of government witnesses." *Id.* (citing *United States v. Wilkes*, 662 F.3d 524, 540 (9th Cir. 2011)) (internal quotation marks omitted). In other words, the defense can open the door to the subject of veracity of the State's witnesses, but, having opened the door, the defense "should not be surprised to see the prosecutor enter." *Lankford*, 162 Idaho at 498, 399 P.3d at 825 (quoting *United States v. Dorsey*, 677 F.3d 944, 954 (2012)). Lastly, "vouching statements, although constituting prosecutorial misconduct, do not constitute a clear constitutional violation." *Id.* (citing *Dunlap*, 155 Idaho at 370, 313 P.3d at 26).

Focusing on the challenged statements, the first and fifth statements will be addressed together because they both contain the phrase, "I would submit." The verb "submit" means "[t]o end the presentation of further evidence in (a case) and tender a legal position for decision." Black's Law Dictionary 1653 (10th ed. 2014). A "submission" is "an argument by counsel in court." Bryan A. Garner, *Garner's Dictionary of Modern Legal Usage* 855 (3rd ed. 2011). In effect, by prefacing his statements with "I would submit," the prosecutor was leaving the issue up to the jury, but believed the evidence supported it. While such a phrase will not save otherwise egregious misconduct, the circumstances here mitigate against finding these comments rise to the level of prosecutorial misconduct. The first statement, **"I would submit to you that she was telling the truth,"** was immediately followed by, "and that's something you have to decide, not me." The fifth statement occurred in the prosecution's rebuttal, after defense counsel weighed in on the credibility of the State's witness thereby "opening the door" to comments on witnesses' testimony. Likewise, the attacked language followed a reference to the evidence presented. ("And you can also consider what the State's evidence was when you consider

32

whether this was self-defense."). While it would be better for the prosecutor to say "the evidence showed" or "you, the jury, will determine" rather than the filler phrase "I would submit," these comments, given their context, do not rise to the level of prosecutorial misconduct.

However, the second, third, and fourth statements in which the prosecutor personally vouched for the reliability of the testimony were improper comments constituting prosecutorial misconduct. It is "improper for a prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence." *State v. Alwin*, 164 Idaho 160, 172, 426 P.3d 1260, 1272 (2018) (quoting *State v. Garcia*, 100 Idaho 108, 110, 594 P.2d 146, 148 (1979). "Such personal statements constitute misconduct because they are a 'form of unsworn, unchecked testimony' that can 'exploit the influence of the government.'" *Id.* (quoting *Garcia*, 100 Idaho at 110, 594 P.2d at 148). Despite the prosecution's admonitions that the credibility determinations are for the jury, the prosecutor introduced "unsworn, unchecked testimony" by stating personal beliefs as to the credibility of testimony or evidence without directly tying it to the evidence.

However, simply because a statement may rise to the level of prosecutorial misconduct does not mean it rises to the level of fundamental error. The possible harm "may be remedied by an instruction from the district court informing the jury that the attorneys' comments are not evidence." *Id.* at 169, 426 P.3d at 1269. Here, both the district court and the prosecutor during argument on rebuttal admonished the jury that the lawyers' closing arguments were not evidence. The district court stated:

> You are to decide the facts from all of the evidence presented in this case. The evidence that you are to consider – excuse me, the evidence you are to consider consists of sworn testimony of witnesses, exhibits which have been admitted into evidence, and any facts to which the parties have stipulated. Certain things you have heard or seen are not evidence, including arguments and statements by lawyers. The lawyers are not witnesses. What they say in their opening statements, closing arguments, and at other times is included to help you interpret the evidence but is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, follow your memory . . . . In a few minutes counsel will present their closing remarks to you, and then you will retire to the jury room for your deliberations. Arguments and statements of attorneys are not evidence. If you remember the facts differently from the way the attorney[s] have stated them, you should base your decision on what you remember.

Likewise, the prosecutor said:

> [Defense counsel] mentioned the State is telling you what to do. I don't think I've told anyone what to do. I think that's been Judge Fitzmaurice [sic] that has told you what to do in the courtroom here. Ladies and gentlemen, this case is

overwhelming on the State's side. Mr. Monson, what he says and what I say is not evidence. What we say is not evidence. I would submit to you I don't have to say a thing. The State's case that we presented proves itself. Just if you block out what Mr. Monson says and what I say, just consider the evidence and the testimony itself by yourself, not how we analyze it but how you do, and the case proves itself without a doubt at all, overwhelming.

Taking both the court's and the prosecutor's admonitions into consideration, we can determine that the prosecutor's comments, while inappropriate, were "not egregious or so inflammatory that the jury instruction would not remedy any consequential prejudice" *Id.* at 173, 426 P.3d at 1273. As a result, these comments do not rise to the level of fundamental error. *Id.*

### 6. The cumulative error doctrine is inapplicable to this case.

Because we find error in only three statements by the prosecution, Godwin's argument under the cumulative-error doctrine is inapplicable. As stated in *Perry*, "it is well-established that alleged errors at trial, that are not followed by a contemporaneous objection, will not be considered under the cumulative error doctrine unless said errors were found to pass the threshold analysis under our fundamental error doctrine." 150 Idaho at 230, 245 P.3d 982. Because Godwin failed to present more than one error that passed the threshold analysis under the fundamental error doctrine, his argument under the cumulative error doctrine fails. *Id.* (citing *State v. Hawkins*, 131 Idaho 386, 407, 958 P.2d 22, 23 (Ct. App. 1998)).

## V. CONCLUSION

For the reasons stated above, the district court did not err in denying Godwin's motion to suppress and Godwin has failed to showed fundamental error entitling him to relief on appeal. The judgment of the district court is affirmed.

Justices BRODY, BEVAN, STEGNER and MOELLER, **CONCUR.**